1   TIMOTHY J. YOO (SBN 155531)
    MONICA Y. KIM (SBN 180139)
2   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3   10250 Constellation Blvd., Suite 1700
    Los Angeles, California 90067
4   Telephone:  (310) 229-1234
    Facsimile:  (310) 229-1244
5
6   Proposed Attorneys for Chapter 11 Debtors and Debtors in Possession

7                   UNITED STATES BANKRUPTCY COURT
8                   CENTRAL DISTRICT OF CALIFORNIA
                        (LOS ANGELES DIVISION)
9

10
    In re:                                )  CASE NO. 2:10-bk-45503-RN
11                                         )  CASE NO. 2:10-bk-45505-RN
                                           )
12  SELIM AMERICA, INC.                    )
                                           )  Chapter 11
13          Debtor.                        )
                                           )  DEBTORS'        SUPPLEMENTAL
14  _____    )  OBJECTION    TO    EMERGENCY
                                           )  MOTION   FILED   BY   HWASEUNG
15  SELIM TEXTILE, INC.                    )  NETWORKS AMERICA, CORP. FOR
                                           )  APPOINTMENT   OF   CHAPTER   11
16          Debtor.                        )  TRUSTEE   AND   SEQUESTRATION
                                           )  OF CASH COLLATERAL
17  _____    )
                                           )  [FILED        CONCURRENTLY
18  ☒ Affects Both Debtors                 )  HEREWITH:
                                           )    • DECLARATION    OF    JUNE
19  ☐ Affects Selim America, Inc. only     )       YONG KIM,
                                           )    • REQUEST    FOR    JUDICIAL
20  ☐ Affects Selim Textile Inc. only      )       NOTICE, AND
                                           )    • EVIDENTIARY   OBJECTIONS
21                                         )       TO    DECLARATION    OF
                                           )       YOUNG DONG CHO]
22                                         )
                                           )  Date:  September 15, 2010
23                                         )  Time: 10:00 a.m.
                                           )  Place: Courtroom 1645
24                                         )         255 East Temple St.
                                           )         Los Angeles, CA
25                                         )
                                           )
26                                         )
                                           )
27                                         )
                                           )
28                                         )
                                           )

**TO THE HONORABLE RICHARD M. NEITER, UNITED STATES BANKRUPTCY JUDGE:**

Selim America, Inc. ("<u>America</u>") and Selim Textile, Inc. ("<u>Textile</u>"), Chapter 11 debtors and debtors in possession herein (collectively, the "<u>Debtors</u>"), hereby file their supplemental objection to the emergency motion (the "<u>Motion</u>") filed by Hwaseung Networks America, Corp. ("<u>Hwaseung</u>") for the appointment of Chapter 11 trustee and sequestration of cash collateral. Previously, the Debtors filed an objection to the Motion which opposed the setting of a hearing on the Motion on an "emergency" basis. By this supplemental objection, the Debtors respond to and address the merits of the Motion. Concurrently herewith, the Debtors have also filed evidentiary objections to the Declaration of Young Dong Cho (the "<u>Cho Declaration</u>") filed in support of the Motion.

In support of their objection, the Debtors respectfully represent as follows:

**I.**

**<u>INTRODUCTION</u>**

These estates are secure and being competently managed by the Debtors and their principal, June Yong Kim ("<u>Kim</u>"), with the assistance of their bankruptcy counsel. The Debtors' business is the product and culmination of long-standing relationships and accounts that Kim has cultivated over the last approximately 4 years with suppliers, vendors and customers. Hwaseung is well aware of this, and knows that a Chapter 11 trustee would not (because he or she could not) maintain the current and future business of the Debtors; therefore, a trustee would simply liquidate the Debtors' assets.

Inevitably, Hwaseung will be waiting to exploit the Debtors' customers for its own financial benefit.  In fact, through illegal means, Hwaseung has already obtained the Debtors' customer information, and is trying to sell goods directly to the Debtors' customers in order to prevent the Debtors from selling its existing inventory.  Therefore, while the appointment of a trustee would benefit Hwaseung's future business and profits, such a result would effectively kill the Debtors' business and reorganization, to the great prejudice of these estates and other creditors.  Stripped of all of the unsubstantiated hyperbole and argument, the Motion is simply the continuing efforts of a creditor to destroy and take over the Debtors' business.

"Cause" to appoint a Chapter 11 trustee does not exist in these cases, and Hwaseung has not provided evidence, let alone the "clear and convincing evidence" necessary to appoint a Chapter 11 trustee in these cases.  Hwaseung's evidence boils down to the testimony of Young Dong Cho, the bulk of which are subject to evidentiary objections filed by the Debtors.  Simply, Hwaseung has failed to meet its high burden of proof that the appointment of a trustee – a truly extraordinary measure – is warranted in these cases.

The Debtors and Hwaseung engaged in business for approximately 2 years since July 2008.  In January 2010, Kim was given loan and related agreements by Hwaseung and its lawyers to sign.  Kim, who is Korean, and, therefore, is not a native English speaker or reader, was not given a chance to consult with his own counsel or really even to read the agreements.  He signed various papers which in some cases were just orphan signature pages to agreements that he did not review.  Prior to January 2010, the parties exchanged millions of dollars worth in goods and money without ever having a written

contract or agreement.  Virtually all of the transactions were conducted orally, and throughout their business relationship, Hwaseung's management required Kim to follow its instructions regarding the Debtors' sales and operations, and exerted significant amount of control over the business of the Debtors.

Hwaseung is a subsidiary or division of a large Korean company known as Hwaseung Group.  Hwaseung started its business in New York at or around the same time that the Debtors started doing business with Hwaseung (around July 2008).  Prior to this time, Hwaseung had never engaged in the yarn and fabric business and had no experience in the yarn and fabric business.  The Chief Executive Officer ("CEO") of Hwaseung is Lee Wan Man ("Lee").  During the approximately 2 years of doing business together, Lee insisted that the Debtors pay funds to him personally as a condition to Hwaseung shipping goods to the Debtors and to maintaining the business relationship.  To Kim's knowledge, Lee had the final authority in whether Hwaseung would or would not release goods to the Debtors.  Originally, Lee suggested that he receive "kickbacks" equal to 3% of the total gross amount of the goods sold by Hwaseung to the Debtors on a monthly basis.  When Kim refused to do this, Lee finally agreed to take .5% as a kickback.  Kim reluctantly agreed because he wanted Hwaseung's goods.  These payments were made to Lee several times per month and used by Lee for his personal spending, such as vacations, shopping, and entertainment. Over the duration of the parties' relationship, Kim estimates that over $500,000 was paid to Lee as "kickbacks".  The Debtors are in the process of obtaining all of the returned checks and other evidence which shows all of the pre-petition "kickback" payments to Lee.

Hwaseung was never kept in the dark as to the details of the Debtors' business as it now alleges, and, in fact, Hwaseung took a very active role in instructing the Debtors how to run the business. Because Hwaseung, as a then newly established company, needed to show to its Korean parent company that it was meeting its sales goals, Hwaseung insisted that the Debtors purchase much more inventory that it would have normally done, which, in turn, forced the Debtors to increase sales at lower prices to their customers. Hwaseung was fully and completely aware that the Debtors were selling goods at lower prices than their competitors, but nonetheless, urged the Debtors to buy more and more goods, even if this meant that the Debtors could not repay Hwaseung for all the goods for a long period of time. Indeed, Kim expressly told Hwaseung's management at the start of their business relationship that, given his experience in the industry, it was not possible to have high sales **and** high margin/profits. In response, Hwaseung's management clearly told Kim that sales were all that they cared about because its Korean company needed to have a high volume of exports out of Korea, and Hwaseung was established in the United States primarily for the purpose of providing its Korean parent company with an outlet of releasing the exported goods. In short, the measure of success for Hwaseung and its Korean parent company was solely the volume of exports and sales. In turn, the Debtors served as the dumping ground for Hwaseung. It was never a secret that, given the volume of goods that was forced upon the Debtors by Hwaseung, the Debtors had to lower their prices to its own customers which resulted in Textile being in arrears on its obligations to Hwaseung. Hwaseung fully understood and knew this, and continued to supply the Debtors with goods. Indeed, by January 2010, Hwaseung claims that it was owed $30

million; however, even though it could have stopped shipping any more goods to the Debtors, it continued to supply and sell goods to the Debtors and Lee continued to insist upon and receive "kickback" payments from the Debtors.

Other than the loan and related agreements made in January 2010 (the validity of which are in question), there is virtually no paperwork between Hwaseung and the Debtors regarding their business transactions. In a nutshell, Hwaseung's Korean parent would ship goods into the United States to Hwaseung and issue bills of lading (the "Korea Bills of Lading"). Hwaseung then gave those goods to Textile, ***but never*** issued any bills of lading. Therefore, there is no documentation of the goods being transferred from Hwaseung to Textile. Rather, Hwaseung would simply give Textile a copy of the Korea Bills of Lading. Hwaseung also never presented to Textile an invoice, and, similarly, Textile never issued a purchase order to Hwaseung. The relationship boiled down to a hodgepodge of telephone calls, whereby Lee (or a different officer of Hwaseung) would call Kim to instruct Kim to cause the Debtors to "take" the shipments that it had received from Korea under the Korea Bills of Lading. In turn, Kim would sell the goods to America's customers. As America received payments from its customers, it (directly or through Textile), made frequent payments to Hwaseung in amounts determined by Kim based on what the Debtors could afford to pay to Hwaseung at that time. Given the lack of any purchase orders or invoices, the payments were simply received by Hwaseung without any complaint. There was no promise of a 90 day repayment obligation as alleged by Hwaseung, and no promises regarding any commissions. See Motion, p. 5, lines 9-13. In fact, on Schedule A of the Revolving Sales Credit Agreement which is attached as Exhibit A to the Cho Declaration, it states

1   as the repayment schedule, "*outstanding invoice due 150 days after Delivery of goods*."

2   Nothing is mentioned of any commissions.

3       The Debtors are not being "grossly mismanaged," no fraud has been or is being

4   committed, and no showing has been made by "clear and convincing evidence" of

5   "cause" to appoint a trustee.  The "overwhelming evidence" that Hwaseung refers to in

6   support of its Motion is entirely false and mere speculative and naked allegations made

7   by Cho who (along with the other members of Hwaseung's management) is desperate to

8
9   save face by trying to kill the Debtors' business and ultimately gain all of the Debtors'

10  financial profits.  All of the same allegations have also been raised in a complaint filed

11  by Hwaseung against the Debtors, Kim, and others in the United States District Court for

12
13  the Southern District of New York, which was filed by Hwaseung on the Petition Date.

14  The non-debtor defendants (including Kim) are vigorously defending that action and are

15  about to seek a dismissal of the RICO and other claims and/o file counter claims against

16
17  Hwaseung and employees of Hwaseung.  The Debtors have also commenced adversary

18  proceedings against Hwaseung for declaratory relief (as to the validity, priority and

19
20  extent of lien and amount of claims), damages for intentional interference with contract,

21  intentional interference with prospective economic advantage, and negligent interference

22  with business relationships, (iii) damages for willful and intentional violation of the

23
24  automatic stay; and (iv) permanent injunction.   The Debtors intend to amend the

25  complaints to add claims for preferential transfers and to add employees of Hwaseung as

26  additional defendants.

27       On the other hand, the appointment of a trustee will surely destroy any possible

28  reorganization of the Debtors because, in the absence of Kim's involvement with the

Debtors and his relationships with suppliers, vendors and customers, the Debtors' business cannot be sustained. Additionally, the Debtors are fully prepared to employ a forensic accountant to investigate all of their books and records to determine whether any fraud has occurred and to assess the extent of the estates' claims against Kim, Lee, and others. The Debtors and Kim will fully cooperate with the accountant's duties and tasks, and his or her report can be submitted directly to the Court.

Under these circumstances, the Debtors submit that the estates are protected, and the Motion should be denied.

## II.

### STATEMENT OF FACTS

A.    **Background.**

1.    On August 23, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Following the Petition Date, the Debtors continue to operate their business and manage their affairs as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtors are owned solely by Kim who runs the day-to-day business affairs of the Debtors.

3.    Kim started the business of the Debtors in 2006 with Textile. Textile was established on April 24, 2006, as reflected by the Certificate of Incorporation from the State of New York, a copy of which is attached as Exhibit "1" to the Declaration of June Yong Kim (the "Kim Declaration") annexed hereto. Kim established America on November 2, 2007. Attached as Exhibit "2" to the Kim Declaration is the Certificate of Incorporation for America from the State of New York.

4.    Generally, the Debtors are engaged in the business of importing various textile goods (e.g., yarns and fabrics) from foreign suppliers, and re-selling those goods to domestic customers.  During the approximately four years in which Kim has operated this business, Kim has cultivated extensive relationships with vendors, suppliers and customers.  Without these connections, the Debtors cannot continue to stay in business.  Prior to 2008, Textile did not buy any product from Hwaseung.

5.    In or about July 2008, after both Textile and America had been created, the Debtors began a business relationship with Hwaseung, which had started a business in the State of New York at or around the same time as a subsidiary or division of its Korean company (Hwaseung Group).  Prior to this time, Hwaseung had never engaged in the yarn and fabric business and had no experience in the yarn and fabric business.  The CEO of Hwaseung is Lee and the Chief Financial Officer ("CFO") of Hwaseung is Cho Young Dong ("Cho").  These individuals were the primary contacts at Hwaseung for Kim.  Kim was told by Lee and Cho that Hwaseung was established in the United States to serve as one of the main outlets for the exports of its Korean company because the Korean company was seeking to aggressively expand and increase exports.

6.    At the beginning of their business relationship, Lee and Cho told and made it very clear to Kim that, in order for Hwaseung and its executives to be perceived as being a success to its bosses who are located in Korea, they needed to show to these bosses that they had an enormous sales volume because it was critical to the Korean company to increase exports of its goods out of Korea.  Attached as Exhibit "3" to the Kim Declaration is an article published in Newsworld which highlights the rapid growth of Hwaseung Group.   Therefore, it was incredibly important for Textile to buy a large

amount of good from Hwaseung.  In response, and having had experience in the marketplace, Kim advised Lee and Cho that it was not possible to achieve high sales **and** high margin-profits.  In other words, if Textile must buy a lot, and, therefore, must sell a lot to its customers quickly, it would have to charge its customers prices which are much lower than what competitors would charge, possibly even below cost.  Lee and Cho understood this, but nonetheless emphasized to Kim that sales were what mattered the most, and that having arrearages by Textile would be an acceptable risk for Hwaseung because it needed to have rapid sales growth.

7.    While Kim did not like the idea of the Debtors losing money and being unprofitable, given Hwaseung's push for the Debtors to buy an enormous amount of goods and the informal nature of the parties' relationship, Kim fully expected the Debtors to sustain a very long-term buying relationship with Hwaseung.  Therefore, while the parties would lose money during the early phase of their growth period, Kim expected that, once the companies established a presence and footing in the marketplace by securing a certain market share of the industry, that their losses would be reduced, and that ultimately, the parties would become profitable.   Kim understood, based on his conversations with Lee and Cho, that Lee and Cho shared these views.

8.    During at least the first 1 and 1/2 years of their relationship, the terms upon which Hwaseung sold goods to the Debtors were never memorialized in writing including repayment terms.  Indeed, until January 2010, the parties had no agreement in place and all of the transactions were conducted orally.  In his declaration filed in support of the Motion, Cho states that "… (iii) Selim Textile would use the proceeds of such sale to pay Hwaseung within 90 days following the sale and delivery of thee goods

by Hwaseung to Selim Textile, minus a commission fee of 6%; and (iv)  Selim Textile would also locate factors to guarantee the outstanding account receivables owing by Selim Textile's customers for a commission fee ranging from 2%-6%." <u>See</u> Motion, p. 5. lines 9-14.   But, this is not true.  Prior to January 2010, there was no agreement as to repayment terms.  In January 2010, Textile signed agreements, but they don't purport to provide for what Cho claims.  Rather, on Schedule A of the Revolving Sales Credit Agreement which is attached as Exhibit A to the Cho Declaration, it states as the repayment schedule, "*<u>outstanding invoice due 150 days after Delivery of goods</u>*." Nothing is mentioned of any commissions.

9.      Generally, the transit of goods to the Debtors and payments to Hwaseung occurred as follows.  The Korean parent would export container of textile goods into the United States via Hwaseung, and in connection therewith, would issue bills of lading (i.<u>e.</u>, the Korea Bills of Lading).  Once the goods were received by Hwaseung, Lee and/or Cho would simply telephone Kim and instruct Kim to purchase all or a designated number of the containers from Hwaseung.  Prices were not discussed.  Payment terms were not discussed.  Purchase orders were never issued.  Invoices were never issued.  No bills of lading were issued.  However, at the time the business relationship started, Lee made it clear to Kim that he expected the Debtors to make "kickback" payments personally to Lee which Lee would use to pay for vacations, shopping, expensive meals and entertainment, and the like.  To Kim's knowledge, Lee had the final authority in determining whether or not to release goods to the Debtors.  Initially, Lee asked for "kickback" payments and gifts equal to 3% of the total gross amount of goods shipped every month.  When Kim refused this as being excessively high, Lee settled on receiving

.5% of the total gross amount of goods shipped every month.  While Kim did not like the idea of having to make these personal "kickback" payments, it was made clear to him by Lee that the Debtors would not receive any product from Hwaseung absent these "kickback" payments.   These payments were made several times per month and were in the form of cash or check.   Over the duration of the parties' business relationship, the Debtors are likely to have paid over $500,000 in these "kickbacks" to Lee.  Given their financial problems, the Debtors attempted to stop payment of these "kickbacks" in January and February 2010.  Again, Lee made it clear to Kim that, absent continuing "kickbacks," he would not send any additional goods to the Debtors.  Kim brought these "kickback" payments to the attention of Young Rip Ko, the Chairman of Hwaseung Group, however, the practice of insisting on these payments did not stop.  The last "kickback" payment was made in June 2010 for $20,000.  A copy of this payment and copies of other checks issued by the Debtors to Lee are attached as <u>Exhibit "4"</u> to the Kim Declaration.  The Debtors are in the process of pulling all of the checks and other documents evidencing these payments.

10.    As evidenced by the checks attached as <u>Exhibit "4"</u> to the Kim Declaration, "kickback" payments were made by checks under the name "Selim America" and "Selim Textile" prior to March 2010.  Indeed, there is payment to Lee dated January 8, 2010 in the amount of $100,000 which was paid to him through a "Selim America" check.  Therefore, the allegation that Hwaseung was not aware of America's existence until March 2010 is entirely false.  In fact, America was set up in November 2007 even before the Debtors started doing business with Hwaseung and Kim never concealed the existence of America from Hwaseung.  Hwaseung knew that

America had an office in Los Angeles, CA while Textile maintained an office in New York, NY.   Even Cho states in his declaration that, shortly after the loan agreements were executed (which was in January 2010), he visited the Los Angeles, CA office of the Debtors which was America's business premises.  See Cho Declaration, p. 3, lines 12-13.   Indeed, even from the start of the business relationship, Lee and Cho suggested to Kim that Kim set up lots of corporations to spread out the assets amongst the various companies.

11.   Once Textile received the instruction on the purchase of the goods, it sold the same goods to America.   America then sold the goods to its customers (thereby generating accounts receivable), and upon receipt of payments on the accounts receivable, paid its debts, including debts owed to its affiliate Textile.   Textile, in turn, repaid its debts to its creditors, such as Hwaseung.   There was no regularity to dates on which Textile rendered payments to Hwaseung, or with regard to the payment amounts. Rather, as Kim received payments from customers, he determined what amount he could afford to pay, and rendered the payments to Hwaseung.   Payments occurred either through Selim Textile check, Selim America check or via wire transfers.   Hwaseung never questioned, inquired or complained about the amounts received or the frequency of the payments until approximately July 2010.  The June 2009 bank statement of Textile, which is attached as Exhibit "5" to the Kim Declaration provides a flavor of the payments made by the Debtors to Hwaseung.  In that month, there were approximately six wires in the amounts of $200,000 (on 6/12), $12,000 (on 6/15), $300,000 (on 6/16), $200,000 (on 6/18), $100,000 (on 6/22) and $17,835 (on 6/26) and two additional checks cleared during that month totaling another $400,000.   Indeed, the Debtors paid to

Hwaseung approximately $5 million in June 2010, $6 million in July 2010 and $2 million for the period from August 1, 2010 to August 13, 2010.

12.    The Debtors and Hwaseung operated in this manner for approximately two years from July 2008 through July 2010.  By then, and as a result of America having to sell their inventory at or below the cost allegedly booked by Hwaseung, which was a practice known to and expected by Hwaseung, Textile's indebtedness to Hwaseung increased.

13.    In January 2010, Hwaseung had its legal counsel prepare loan agreements for Kim to sign on behalf of Textile.  Kim, whose first language is not English and is not fluent in English, was not given a chance to hire legal counsel to review these agreements, and was not given an opportunity to even read the agreements.  Frankly, even if Kim read the agreement, he would not understood what he was signing.  In addition, Hwaseung presented a lot of papers for Kim to sign, including in some cases, orphan signature pages.  With regard to certain of the agreements such as the Security Agreement, it appears that the signatures were altered (i.e., cut and pasted into the agreement by using a signature from a different document).  Because Kim did not really know what to do and was given no time or opportunity to think about these documents, he provided signatures to all or some of the agreements.  The signature pages have no signatures of witnesses, and are not notorized although the documents purport to have required notary acknowledgments.  Kim was never given fully executed copies of these agreements.  Given these defects and the circumstances under which they were signed (if signed at all), the Debtors now question whether these documents and agreements are valid and enforceable at all.

14.    In the Debtors' view, the January 2010 loan agreements which go to extending sales credit of up to $30 million to Textile clearly evidence Hwaseung's knowledge and expectation of the losses that the Debtors would sustain as a result of Hwaseung's "dumping" of goods upon the Debtors.    After Hwaseung obtained the January 2010 loan agreements for sales credit up to $30 million, it continued to "dump" goods upon the Debtors and the parties continued to do business in the same manner as they were previously handled.    In fact, the Promissory Note which is attached as Exhibit B to the Cho Declaration expressly requires the Debtors to purchase textile and fabrics from Hwaseung exclusively even if the Debtors end up owing $30 million to Hwaseung:

> "*The Promisor agrees that as consideration for Promisee to enter into this Promissory Note and Revolving Sales Credit, Promisor will only purchase Textiles and Fabrics from Promisee exclusively.  This covenant shall continue in duration so long as this Promissory Note and Revolving Sales Credit Agreement is in full force and effect.*"

15.    However, by July 2010, Hwaseung suddenly became enraged at the Debtors as a result of the growing receivable owed to it by Textile, which had been known to Hwaseung for a significant period of time.  In his declaration, Cho claims that "Hwaseung sent various correspondences to alert Selim Textile regarding the overdue balance, seeking immediate payment, but to no avail" (see Motion, p. 5, lines 16-18); however, no copies of the correspondence are provided.  Indeed, such a statement is false because the Debtors never received any such letters or correspondence from Hwaseung.

16.    Suddenly, Hwaseung demanded that the Debtors execute different documents such as a Joint Sales Agreement which would have forced the Debtors to sell all of their assets and hand over all of the sale proceeds to Hwaseung without regard to the other creditors which assert senior liens upon the Debtors' assets as described below.

More specifically, approximately one day before filing the complaint in New York, Hwaseung tried to force Kim to sign the Joing Sales Agreement. Kim was summoned to meet with the following individuals: Jeffrey Jones (counsel for the parent company, Hwaseung Group), and Young Rip Ko, the Chairman of Hwaseung Group. At the meeting, Kim was threatened with criminal prosecution unless Kim signed the document. Indeed, in the document itself it states that Hwaseung would forgo its legal remedies including "the filing of … criminal complaints..." Kim refused to sign the document Hwaseung had prepared despite their threat of sending him to prison if he did not sign. A copy of this Joint Sales Agreement is attached as <u>Exhibit "6"</u> to the Kim Declaration. Hwaseung also began to exercise "self-help" remedies, such as instructing the third party logistics company known as Frontier Logistics Services ("<u>Frontier</u>") used by the parties to stop shipping goods to America's customers, demanding that Frontier forward to Hwaseung all of the information and documents it had on the Debtors including confidential and proprietary customer information, and contacting (without any consent or notice to the Debtors) all of the Debtors' customers, suppliers, vendors and even employees to obtain information about the Debtors.

17.    Additionally, on August 23, 2010, Hwaseung filed a lawsuit in the United States District Court for the Southern District of New York against the Debtors, Kim, and other individual and corporate defendants. Without ever having served the complaint on any of the defendants, Hwaseung proceeded to obtain a temporary restraining order on August 24, 2010, after the filing date of these cases. As a result of these bankruptcy cases, the provisions of that order are void as against the Debtors. The non-debtor defendants have now retained counsel in that action and will be seeking to

dismiss the RICO and other claims and filing counter and cross claims against Hwaseung and its employees.    The Debtors have also commenced adversary proceedings against Hwaseung for declaratory relief (as to the validity, priority and extent of lien and amount of claims), damages for intentional interference with contract, intentional interference with prospective economic advantage, and negligent interference with business relationships, (iii) damages for willful and intentional violation of the automatic stay; and (iv) permanent injunction.    The Debtors intend to amend the complaints to add claims for preferential transfers and to add employees of Hwaseung as additional defendants.

18.    Notwithstanding the filing of these cases, Hawseung has continued its bullying tactics of contacting the Debtors' vendors (including Frontier and the Debtors' other logistics and warehouse provider, Uni Global Logistics), its creditors (including Hana Financial, Inc. and Prime Business Credit, Inc.) and its customers and employees seeking information about the Debtors and Kim.    These tactics constitute willful and intentional violations of the automatic stay provisions and the Debtors reserve all of their claims against Hwaseung and its employees, representatives and agents in this regard.

19.    For example, Susan Kang, a former manager of America, has not appeared at work since the filing date of August 23, 2010 and has not returned any messages left for her by Kim.    As the manager, Kang possessed a lot of confidential customer and other business information, which was known only to Kim and Kang.    It is now apparent that Kang has been leaking customer and other business information to Hwaseung because Hwaseung has revealed that it knows the information which was previously known only to Kim and Kang.    Kang has also deleted all of the emails she sent and

received during the approximately three weeks of August 2010. The Debtors are in the process of obtaining the back-ups on these emails.

20.    Pre-petition, America and Prime Business Credit, Inc. ("Prime") entered into a non-borrowing factoring agreement whereby Prime essentially guaranteed the payment of certain accounts receivable assigned to it by America. To secure America's obligations to Prime, America's assets are subject to a lien in favor of Prime which currently has a liquidated claim of approximately $3,000 and a contingent claim of approximately $372,000 arising from a letter of credit issued pre-petition to secure the obligations of America to a foreign supplier. In addition, the assets of Textile are subject to a lien in favor of Industrial Bank of Korea, New York Branch ("IBK") which is senior to the purported lien of Hwaseung. IBK was owed approximately $2.5 million as of the Petition Date, and, in addition to the liens against Textile's assets, Textile's indebtedness to IBK is secured by a pre-petition letter of credit in the amount of $2.2. million.

21.    Absent Chapter 11, it was clear that Hwaseung wanted to destroy the Debtors' business and seize all of the Debtors' assets, without any notice to Prime (which has a senior and only lien on America's assets) and to IBK (which has a lien senior to any purported lien of Hwaseung). The Joint Sales Agreement is an example of Hwaseung's intentions. Additionally, Kim learned, based on discussions with counsel, that there might be problems with the status of the lien asserted by Hwaseung given the circumstances surrounding the loan agreements and the signing thereof, the defects in the financing statement, and the extent of control exercised by Hwaseung upon the Debtors. With regard to the latter, based on the magnitude of the "control" exercised by members of Hwaseung over Kim and the Debtors' business, Hwaseung may be deemed to be an

"insider" of the Debtors' estates. Should that determination be made, then the granting of the security interest by Textile to Hwaseung, as well as all payments received by Hwaseung and Lee during the one year period prior to the Petition Date may be voidable as preferential transfers. In order to prevent the seizure of all of their assets from Hwaseung's reach, Kim filed these cases on an emergency basis.

22.    Clearly, Hwseung's motive behind the Motion is not to protect these estates from Kim. Rather, the elimination of Kim from the business kills the Debtors, which allows for Hwaseung to take over the Debtor's customers which Hwaseung has already started to do based on confidential information diligently and illegally obtained by Hwaseung from third party sources. If Hwaseung was truly interested in the truth and preserving the business for the benefit of all creditors, it should have suggested the employment of an independent forensic accountant to investigate the Debtors' prior transactions as the Debtors are now suggesting, without attempting to "push the Debtors off the ledge" by getting rid of Kim who the Debtors cannot operate without.    As aforementioned, the Debtors have no problem with the Court's employment of an independent forensic accountant to investigate the Debtors' prior transactions should it deem necessary or prudent under the circumstances of this case. The Debtors will give the accountant full and complete access to all of their books and records, so that s/he can investigate all transactions and payments, including any and all payments received by Kim and Lee.

**B.**    **There is no "overwhelming evidence" that Kim has engaged in RICO violations, fraud, fraudulent transfers, concealment of the Debtors' assets, conversion and conspiracy to default**.

23.    The "overwhelming evidence" that Hwsaeung speaks of boils down to the Cho Declaration, who is purported to be the CFO of Hwaseung.  However, the contents of the declaration are objectionable and inadmissible as reflected in the evidentiary objections filed by the Debtors to the declaration concurrently herewith.  The objections should be sustained, which leaves Hwaseung with NO evidence to support its outlandish accusations.

24.    The Debtors have obtained an extension of time to file their schedules of assets and liabilities through September 23, 2010.  However, the Debtors have already identified the key assets of these estates, which are listed in Exhibit "7" attached to the Kim Declaration annexed hereto.[1]  As identified therein, Kim acknowledges that he personally received loans from the Debtors, and that the Debtors' funds were used to pay for certain personal and real property taken under Kim's personal name such as vehicles.  However, all of these transactions will be disclosed in the schedules and statements of financial affairs, and, if necessary, the estates can and will hire special counsel to ensure that the estates' claims against Kim are preserved and prosecuted.  In any event, all of these payments and loans will be revealed to and investigated by the independent forensic accountant if one is deemed to be necessary by the Court.

25.    The loans and payments given by the Debtors to Kim or on behalf of Kim, all of which will be properly and timely disclosed, does not rise to the level that disqualifies Kim to serve as the fiduciary to these estates, especially given that the

---

[1] This information was originally prepared and provided to Hwaseung and its counsel in connection with confidential settlement discussions protected under Rule 408 of the Federal Rules of Evidence.  In breach of Rule 408, counsel for Hwaseung delivered the information to the Office of the United States Trustee.

Debtors' business cannot survive without Kim. The sole basis of the allegations is that the Debtors "fraudulently transferred and concealed" assets relate to the approximately $59 million claim that Hwaseung alleges is owed to it by Textile. The Debtors dispute the claim of $59 million. Despite knowing the answer, Hwaseung asks "[w]hat happened to the $59 million worth of unpaid inventory that Hwaseung sold to Selim Textile?" See Motion, p. 4, lines 11-12. The simple answer is the following.

26. As of the filing date of the Debtors' cases, America had inventory with a market value of approximately $12 million and accounts receivable of approximately $8.8 million, for a total of approximately $21 million. Based on Hwaseung's math, the difference between its purported claim of $59 million, minus the value of America's assets, equals the cash allegedly diverted by Kim. However, that does not reflect the reality of the parties' relationship which is described above whereby Hwaseung dumped goods upon the Debtors, and, as a result, the Debtors were forced (as Hwaseung was fully aware) to sell the goods at lower prices, including at below the prices charged by Hwaseung (which was never negotiated by the parties). As a result, the Debtors suffered tremendous losses, which, over time, Kim believed would be reduced. With longevity, the Debtors expected that they and Hwaseung would have established themselves in the marketplace, and ultimately make profits from their businesses. In the meantime, Kim does not dispute that some of the Debtors' revenue was used to cover loans to, and purchases for, Kim, for which the estates have claims against Kim for approximately $1.5 to $2 million. Some of the Debtors' revenue was also used to fund "kickback" payments to Lee in excess of $500,000. However, the bulk of Textile's unpaid balance to Hwaseung is simply the losses associated with the Debtors having had to sell its goods

at below what was being charged by Hwaseung (which was never subject to any negotiations) in order to meet the demands of Hwaseung to buy all or most of the goods exported from Korea. Selling at or below what Hwaseung charged the Debtors was not a crime or fraud.

27.    Kim and the other non-debtor defendants have retained counsel in the New York District Court action commenced by Hwaseung, and counsel intends to seek a dismissal of the RICO and other claims in that action and/or file counter-claims against Hwaseung.

28.    Kim has not committed any RICO violations, fraud, fraudulent transfers, concealment of the Debtors' assets, conversion or conspiracy to default.    As aforementioned, the Debtors are fully prepared to employ a forensic accountant to investigate all of their books and records to determine whether any fraud has occurred. The Debtors and Kim will fully cooperate with the accountant's duties and tasks, and his or her report can be submitted directly to the Court.

**C.    The Debtors and Kim did not forge any documents or falsely represent any relationship with Prime Business Credit, Inc.**

29.    Hwaseung claims that Kim "repeatedly" informed Hwaseung that $49 million of Textile's accounts were guaranteed by Prime.  Hwaseung also makes the claim that Kim "forged" AR summaries.  These allegations are not true, and there is absolutely no basis for such accusations.

30.    Prior to the pre-petition factoring agreement between Prime and America, Textile explored the idea of entering into a factoring agreement with Prime.  However, a final agreement never materialized, and Kim never represented to anyone at Hwaseung,

let alone "repeatedly," that Prime guaranteed any accounts of Textile.  Hwaseung also apparently never bothered to independently confirm the relationship between Prime and the Debtors despite having been owed almost $50 million at the time it claims that Kim lied about the Prime-Textile relationship.

31.    With regard to AR summaries, Kim never forged any documents or made any phony documents.  In Hwseung's world – a world in which it never invoiced Textile for any goods – Hwaseung determined that the total amount owed to it by Textile would be the same or higher amount than what Hwaseung was charged by its Korean exporting parent company, as reflected in the Korea Bills of Lading.  Hwaseung also knew that it was impossible for the Debtors to sell all of the goods "dumped" on it by Hwaseung to its customers at prices equal to or higher than what the Debtors were being charged by Hwaseung.  Therefore, the Debtors would suffer losses.

32.    Notwithstanding this reality which Hwaseung was clearly aware of, Hwaseung insisted that Kim give to Hwseung the Debtors' customer invoice information *as they correlate to Textile's outstanding indebtedness to Hwaseung* (which was inflated due to the losses that Hwaseung knew of at all times).  Kim simply complied with Hwaseung's requests, but now is unfairly being accused of having forged or of having made phony documents.  The accusations are completely and wholly baseless.

**D.    <u>Demanding that the third party warehouse release the Debtors' goods which constitute property of the estates is consistent with the exercise of the Debtors' fiduciary obligations to the estates and creditors.</u>**

33.    Remarkably, Hwaseung claims that Kim is in breach of his fiduciary obligations to the estates by having demanded that Frontier, which was holding over $10

million of the estates' inventory as of the Petition Date (but owed only approximately

$2.4 million for unpaid, pre-petition fees) immediately turn over property of the estates.

See Motion, p. 4, lines 26-28. Clearly, Hwaseung is upset that Frontier was required by

the Bankruptcy Code to surrender estate property to the debtors in possession, and, as a

result, its ability to seize such goods have weakened.

34.    Indeed, even counsel for Frontier, the law firm of Squire Sanders, agreed

that, even though Frontier asserts a warehouseman's lien upon the goods in its

possession, in light of Chapter 11, there was no legal basis for Frontier to hold over $10

million of inventory hostage. As a result, shortly after getting in touch with Frontier's

counsel, Frontier released all of the inventory with the exception of $2.5 million worth of

inventory (the "Holdback Inventory"). Additionally, the parties entered into adequate

protection stipulations with regard to the Holdback Inventory, which have been approved

by the Court. Therefore, Hwaseung's argument that Kim is not acting within his

fiduciary obligations by asking the third party warehouse to turn over property of the

estates is nonsensical.

**E.      Hwaseung's lien is disputed, and the Debtors have filed complaints for declaratory relief in this regard and also for damages.**

35.      Hwaseung argues that it has a validly perfected and enforceable security interest and lien upon the asset of Textile, including Textile's accounts receivable and inventory which do not exist.  The sole legal basis for this argument is the purported granting of a security interest which occurred around January 2010 and the UCC financing statement filed by Hwaseung in the State of New York in May 2009, approximately six months prior to the purported granting of a security interest. However, the purported lien of Hwaseung appears very problematic.

36.      The Security Agreement which is attached as Exhibit C to the Cho Declaration is a five page agreement.  Oddly, there is a significant amount of space between the end of the narrative of the agreement and the signature line for Kim.  While Kim (who is not a native English speaker or reader) recalls signing various documents in January 2010, since he was never given the opportunity to consult with counsel, it is possible that he did not sign the Security Agreement.  The 6th page of the Security Agreement provides for a notary signature, but none exists.

37.      Even assuming the Security Agreement is valid, under the agreement, **Textile** purported to grant to Hwaseung a security interest and lien upon the following:

> "A.      All equipment, fixture, furniture, leasehold improvement, lease, stock, supply, inventory goods, contractual rights, chattel paper, trade name, trade good now and hereafter to be acquired by Selim Textiles, Inc. for the premises at 358 5th Ave., Suite 3021, New York, New York and wherever they may be located.
>
> B.      All the outstanding shares of Selim Textiles Inc. held by June Yong Kim.

C.    All the Outstanding account receivables existing at the time of declaration of default by the Secured Party."

38.    Hwaseung purported to record a UCC financing statement with the Office of the Secretary of State of New York on May 26, 2009, <u>approximately six months before the Security Agreement</u>.    Additionally, the description of the collateral purportedly covered by the UCC financing statement is very ***different*** from the description of the collateral set forth in the Security Agreement.    The UCC financing statement describes the collateral simply as:

> "All equipment, fixture, furniture, leasehold improvement, lease, stock, supply, inventory goods, contractual rights, chattel paper, trade name, trade good now and hereafter to be acquired by Selim Textiles, Inc. for the premises at 358 5th Ave., Suite 3021, New York, New York 1001 (See the Exhibit A).   THE FINANCING STATEMENT IS EFFECTIVE UNTIL TERMINATION."

There is no Exhibit A attached to the UCC financing statement recorded by Hwaseung with the Office of the Secretary of State of New York despite the language of the financing statement.  Also, the description of the collateral in the financing statement appears to limit the collateral to those items described which are located in New York.

39.    The financing statement also identifies the debtor as Selim Textiles, Inc. which is not the correct name of Textile.

40.    Additionally, as mentioned above, based on the magnitude and scope of the instructions given to the Debtors, Hwaseung may constitute an "insider" of the estates.  If deemed to be an "insider," then the granting of the security interest, as well as all of the payments received by Hwaseung, Lee and anyone associated with Hwaseung during the one year period prior to the Petition Date could be voided as preferential

transfers.  In sum, the Debtors believe that the Security Agreement may be invalid, the financing statement is totally defective against Texile and Hwaseung did not properly perfect its security interest against the assets of Textile.  Therefore, pursuant to Section 544 of the Bankruptcy Code, the purported lien of Hwseung can be voided.  Additionally, as an "insider," any transfer of a lien pursuant to the Security Agreement or otherwise, may be voidable as a preferential transfer pursuant to Section 547 of the Bankruptcy Code.   Therefore, Hwaseung may not be a secured creditor of Textile at all.

**F.    Kim does not own any shares in Keystone Textiles, Inc. and Kim does own 75% of Globiz Clothing, Inc. for the purpose of maintaining a visa.**

41.    Hwaseung surmises, without any evidence, that Kim may be a shareholder of Keystone Textiles, Inc. ("Keystone"), which is a customer of America.  However, Kim is not a shareholder of Keystone.  Hwaseung further surmises, again without any evidence, that the Debtors sold goods to Keystone at below market prices and received cash kickbacks.  However, this is also false.  While it is no secret that Kim is friendly and has a very amicable business relationship with the principal of Keystone, the Debtors have not shown as special favors for Keystone.  An investigation by the forensic accountant would verify this.

42.    Kim is however a shareholder of Globiz Clothing, Inc. ("Globiz").  Kim is a Korean national, who resides in the United States pursuant to an E-2 visa.  In order to obtain this visa, it was necessary for him to make an investment in the United States, which Kim did by investing the sum of $150,000 to Globiz.  Kim used the funds that he obtained as loans from America as reflected in Exhibit "7" attached to his declaration to

make this investment.  However, on or about December 12, 2009, Kim repaid the loan to

America.  Again, an investigation by the forensic accountant would verify this.

**G.**    **No basis exists for preventing the Debtors from operating its business and sequestering "cash collateral".**

43.    In the alternative to the appointment of a trustee and without making the appropriate showing, Hwaseung essentially seeks an injunction prohibiting the Debtors from "using, selling or leasing" any property of the Debtors' estates or imposing conditions on any sale of inventory, and asking for a declaration of "all inventory furnished by Hwaseung to the Debtors from January 1, 2010 to the present." Additionally, Hwaseung wants the Debtors to "sequester" cash collateral, without specifying what that even means.

44.    The Debtors have filed a motion for authority to use cash collateral asking for Court authority to use their revenue to pay the basic expenses of the companies which must be paid to avoid irreparable harm to the companies.  These expenses boil down to purchase of goods, and payment of warehouse and freight fees, factor fees, rent, utilities, payroll, office supplies, parking and meals.  The Court has not yet approved this motion, and, if approved, the Debtors will spend their cash only as authorized by the Court.

45.    All other post-petition funds will remain in the debtor in possession general bank account opened by America (the "DIP Account").  Post-petition, Hwaseung demanded that counsel for the Debtors send to all customers a letter instructing them to wire all post-petition payments into the DIP bank account.    Rather, counsel for the Debtors have agreed to send letters to the Debtors' customers indicating that all post-

petition payments should be made by check and sent to counsel for the Debtors. Counsel for the Debtors will then send the checks to Kim for deposit into the DIP bank account. Given this, there is no need to "sequester" any cash in these cases.

46.     Additionally, the request that the Debtors simply not sell any goods during these cases or impose conditions regarding sales in these cases is absurd, and further reinforces Hwaseung's motives to hurt the Debtors' business for its own financial gains. Such a request would also result in the shut down of the Debtors' business within the first three weeks of the cases and rob other creditors of these estates from maximizing their recoveries in these cases. There is no basis for granting the relief requested.

## III.

## **DISCUSSION**

## A.     **Hwaseung's Motion is Supported by No Credible Evidence, Much Less Than the Quantum of Evidence Needed to Satisfy Hwaseung's High Burden of Proof**

As a matter of law, the appointment of a trustee is not warranted. Under 11 U.S.C. § 1104, a court "shall" appoint a trustee for "cause" or "in the best interest of the creditors." 11 U.S.C. § 1104; In re Klein/Ray Broadcasting, 100 B.R. 509, 511 (9th Cir. B.A.P. 1987). Specifically, the circumstances under which a court may order the appointment of a trustee or examiner is set forth in the statute as follows:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1104.

It is well settled that the appointment of a trustee is the exception rather than the rule and that the standard warranting appointment of a trustee is very high.  In re G-I Holdings, Inc., 385 F. 3d 313, 318 (3rd Cir. 2004); In re Sharon Steel Corp., 871 F.2d 1217, 1225 (3d Cir.1989); In re Adelphia Commc'n Corp., 336 B.R. 610 (Bankr. S.D.N.Y. 2006); 7 Collier on Bankruptcy ¶ 1104.02 (Henry J. Sommer & Alan N. Resnick eds. 15th ed. rev. 2006 )("Collier").  Appointing a trustee in a Chapter 11 case is an "extraordinary" remedy, and there is a corresponding "strong presumption" that the debtor should be permitted to remain in possession because "current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate."  Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 577 (3rd Cir. 2003);   In re The 1031 Tax Group, LLC, No. 07-11448 MG, 2007 WL 2298245, at *4 (Bankr. S.D.N.Y. August 13, 2007); In re G-I Holdings, Inc., 385 F. 3d at 318; In re V. Savino Oil & Heating Co., 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989); Collier ¶ 1104.02 [1] (15th rev. ed. 1998).

The presumption in favor of the debtor retaining possession places a "substantial burden" on the party seeking the appointment of a trustee.  Not only does the party seeking appointment of a trustee have the burden of proof, but [t]he evidence supporting the motion for the appointment of a trustee must be "clear and convincing."  See, Sharon

30

Steel, 871 F.2d at 1226 ("The Movant… must prove the need for a trustee by clear and convincing evidence."); In re Clinton Centrifuge, Inc., 85 B.R. 980, 984 (Bankr. E.D.Pa. 1988) ("[T]he evidence needed to justify the appointment of a 'trustee must be "**clear and convincing**." - as opposed to the usual preponderance standard."); In re General Oil Distributors, Inc., 42 B.R. 403, 408 (Bankr. N.Y. 1984); In re Tyler, 18 B.R. 574, 577 (Bankr. Fla. 1982).

Additionally, "[o]n a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct.  Speculation that a debtor may do something in the future does not overcome the strong presumption that the debtor should be permitted to remain in possession in a Chapter 11 case or justify the additional costs of a trustee.  In re Sletteland, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (citations omitted); Ad Hoc Committee of Bondholders v. Citicorp Venture Capital Ltd. (In re Fairwood Corporation), 2000 WL 264319, *14-15 (S.D.N.Y. 2000), aff'd, 242 F.3d 364 (2d Cir. 2001).  Indeed, "one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protections of chapter 11.  In re Anchorage Boat Sales, Inc., 4 B.R. 635, 645 (Bankr. E.D.N.Y. 1980), see generally 5 Collier on Bankruptcy 1104.01[c] at 1104-21 (15th ed. 1983).  See also In re General Oil Distributors, Inc., 42 B.R. 402, 410

**1.    "Cause" for Appointment of a Trustee Requires Extreme Circumstances; Only Egregious Wrongdoing Amounts to Cause.**

While the Debtors may have claims against Kim for recovery of loans and payments made for his personal benefit, that law is clear that in determining whether there is incompetence, dishonesty, gross mismanagement, or fraud for purposes of

1  Section 1104(a)(1), the question is "whether the conduct shown rises to a level sufficient

2  to warrant the appointment of a trustee.  Obviously, to require the appointment of a

3  trustee, regardless of the consequences, in the event of an act of dishonesty by the

4  debtor, however slight or immaterial, could frustrate the purpose of the Bankruptcy

5  Code."  Dalkon Shield Claimants v. A.H. Robins Co., Inc., 828 F.2d 239, 242 (4th Cir.

6  
7  1987).  See also, General Oil Distributors, 42 B.R. at 409.  Thus, the courts have

8  consistently refused to appoint a trustee simply because the debtor has experienced

9  
10  severe financial problems, is insolvent, or has even made imprudent business decisions;

11  these are not "conclusive of the debtor's lack of integrity or his inability to superintend

12  the reorganization."  In re Eichorn, 5 B.R. 755, 757 (Bankr. D. Mass. 1980).

13  
14       Moreover, trustees did not replace debtors in other cases involving egregious

15  conduct; courts will not exercise their discretion to appoint a trustee unless it is clear that

16  the debtor will continue its misconduct.  For example, in In re General Oil Distributors,

17  the debtor's principals engaged in countless pre-petition transactions not even colorably

18  
19  defensible, including transferring and selling assets of the debtor and using the proceeds

20  to benefit a personal business, and taking personal positions in the oil futures market

21  opposite to those of the debtor taken under such principal's supervision.  Id. at 404-05.

22  Despite such blatantly inappropriate transactions, the court exercised its discretion to

23  deny the motion to appoint a trustee, stating:

24  
25          The findings show numerous instances of conduct approaching
        gross mismanagement, violations of fiduciary obligations,

26          incompetence and dishonesty.  Under the circumstances herein,
        the court must find that their conduct does not constitute that

27          which would mandate the appointment of a trustee.

28  Id. at 410 (emphasis added).

Presented with similar conduct, the Court of Appeals for the Fourth Circuit affirmed the denial of a motion to appoint a trustee.  <u>Committee of Dalkon Shield Claimants v. A.H. Robins Co.</u>, 828 F.2d 239 (4th Cir. 1987) ("<u>Robins</u>").  In violation of both the letter and the spirit of the Bankruptcy Code, as well as prior order of the court, the debtor in <u>Robins</u> (i) utilized its subsidiaries as conduits for making charitable contributions, investments, and payments of pre-petition indebtedness, (ii) paid pre-petition claims of present and former executives and pre-petition claims arising under unassumed executory contracts, and (iii) made payments to settle an employee's pre-petition lawsuit.  <u>Id.</u> at 240.

The Fourth Circuit Court of Appeals emphasized that, although the debtor's conduct warranted the contempt sanction imposed by the lower court, whether such conduct constitutes "cause" for the appointment of a trustee is a matter of judicial discretion that was exercised properly below:

> [A] policy of flexibility pervades the Bankruptcy Code with the ultimate aim of protecting creditors.  A determination of cause, therefore, is within the discretion of the court and due consideration must be given to the various interests involved in the bankruptcy proceeding.

<u>Id.</u> at 242.  Indeed, implicit in the court's determination was the precept that a "bad act," or even a series of "bad acts" indicating fraud, dishonesty, gross mismanagement or incompetence, is not a *fortiori* cause to appoint a trustee.  Rather, cause emerges only when that conduct rises to a level such that extraordinary action must be taken.

Thus, in <u>In re Clinton Centrifuge</u>, 85 B.R. 980 (Bankr. E.D. Pa. 1988), the court denied appointment of a trustee despite the debtor's fraudulent conveyance, the debtor's formation of a corporation for the purpose of shielding assets from execution by the

1    fraudulent conveyance judgment creditor, and the debtor's unauthorized execution of

2    numerous pre-petition lease agreements with the newly formed corporation.  Id. at 981-

3    82.  The court stated:

> [W]hether cause exists to appoint a trustee is largely a matter of degree.  In most bankruptcy cases there will be some display of mismanagement, some disregard or oversight of statutory provisions, and some legitimate concerns raised by creditors that creditor interests would be better served by replacing current management.  The question becomes whether these concerns rise to a level justifying the extraordinary relief.

Id. at 987.

Similarly, in Official Creditors; Comm. v. The Liberal Market, Inc. (In re The Liberal Market, Inc. ), 13 B.R. 748. 751 (Bankr. S.D. Ohio 1981), the court refused to appoint a trustee despite the fact that the debtor's president had transferred funds from the debtor to a family corporation and to salaried employees for "vacation pay."  The court found that even though these transfers indicated a "callous disregard of the fiduciary duties incumbent upon the officers of the Debtor-in-Possession," they did not demonstrate fraud or dishonesty sufficient to establish cause for the appointment of a trustee.  Id. at 750-51.

Here, there is no evidence, and certainly not the required "clear and convincing" evidence of dishonesty, fraud, incompetence or gross mismanagement requiring this Court to appoint a chapter 11 trustee.

**2.    "Cause" Requires that Kim Presents A Danger To the Estates or To Creditors.**

The result in the foregoing cases illustrates the prophylactic principle underlying Section 1104.  Congress did not intend Section 1104 to punish an estate on the basis of

1    prior history or financial difficulty.  Rather, Congress provided courts with a mechanism

2    to protect creditors and the estate where such protection was so necessary as to warrant

3    the excessive costs involved in a trustee.

4

5           Th[e] appointive power of the court is to be exercised only where
           the protection afforded by a trustee is needed and the costs and
6           expenses of a trustee would not be disproportionately higher than
           the value of the protection afforded.  This test…requires the court
7           to be mindful of any additional costs or expenses to the estate
           which could result from the appointment of a trustee.  (H.Rept.
8           No. 95-595 to accompany H.R. 8200, 95th Cong. 1st. Sess. (1977)
           pp. 402, 403, U.S. Code Cong. & Admin. News 1978, p. 5787.)
9

10   In re William A. Smith Const. Co., 77 B.R. 124, 126 (Bankr. N.D. Ohio 1987) (emphasis

11   added).  Where no danger to the estate persists, no justification exists for the burden and

12   expense of the displacement of the debtor and the appointment of a trustee.  Here, there

13   is no danger to the estates by keeping the debtors in possession.  There is no evidence

14   that the Debtors are not complying with its duties and obligations under the Bankruptcy

15   Code, the Bankruptcy Rules and the Guidelines of the Office of the United States

16   Trustee.    A  trustee  would  not  only  kill  the  Debtors'  business,  but  increase  the

17   administrative costs of these estates.  Therefore, the appointment of a trustee will not

18

19   further, and will in fact destroy the Debtors' reorganization efforts.

20

21         Here, upon a full consideration of the facts set forth above, it is evident that

22   Hwaseung has failed to demonstrate by "clear and convincing evidence" that Kim or the

23   Debtors exhibited any conduct constituting "cause" for the appointment of a trustee or

24   even  remotely  approaching  the  fraud,  dishonesty,  incompetence,  and  gross

25   mismanagement necessary to establish cause.  Hwaseung has not met its burden of proof

26   and has wholly failed to make the requisite showing for the appointment of a trustee.

27

28

Hwaseung's request for a trustee should be denied and Debtors should be allowed to proceed with their reorganization without the unnecessary costs and burdens of a chapter 11 trustee.

**B.  Appointment Of A Trustee Would Be Contrary To The Interests Of Creditors.**

A court's appointment of a trustee under Section 1104(a)(2) requires a finding by the court that clear and convincing evidence has been presented showing that the appointment of a trustee is in the best interest of creditors, equity security holders and other interests of the estate.  In re Parker Grande Development, Inc., 64 B.R. 557, 561 (Bankr. S.D. Ind. 1986), citing In re Hotel Assoc., 3 B.R. 343 (Bankr. E.D. Pa 1980).

> [U]nder subsection (a)(2), the Court may utilize its broad equity powers to engage in a cost-benefit analysis in order to determine whether the appointment of a trustee will be in the interests of creditors, equity security holders, and other interests of the estate.

In re Anchorage Boat Sales, Inc.  4 B.R. 645, 644 (E.D.N.Y. 1980), citing In re Hotel Assoc., supra.  See also, Sharon Steel, 871 F.2d at 1226; In re Savino Oil & Heating Co., 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).

Here, the costs associated with hastily appointing a chapter 11 trustee now, a mere three weeks into the cases, while Debtors and its principal, Kim, with critical relationships with suppliers, vendors and customers, have properly managed Debtors' business, clearly outweighs any perceived benefits of a trustee.

Hwaseung's motion to appoint a chapter 11 trustee should be denied.

# IV.

## <u>CONCLUSION</u>

For all of the reasons set forth herein and all papers filed by the Debtors in opposition to the Motion, the Debtors request that the motion be denied and that the Court grant such other justice or relief as it deems appropriate and proper.

Dated:  September 7, 2010          SELIM AMERICA, INC.
                                   SELIM TEXTILE, INC.

                          By:   */s/ Monica Y. Kim*
                                   Timothy J. Yoo
                                   Monica Y. Kim
                                   LEVENE, NEALE, BENDER, YOO
                                         & BRILL L.L.P.
                                   Proposed Attorneys for Chapter 11 Debtors
                                   and Debtors in Possession

| In re  SELIM AMERICA, INC.,<br>In re  SELIM TEXTILE, INC.,                    Debtor(s). | CHAPTER  11<br>CASE NO 2:10-bk-45503-RN<br>CASE NO 2:10-bk-45505-RN |
|---|---|

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA  90067

A true and correct copy of the foregoing document described **DEBTORS' SUPPLEMENTAL OBJECTION TO EMERGENCY MOTION FILED BY HWASEUNG NETWORKS AMERICA, CORP. FOR APPOINTMENT OF CHAPTER 11 TRUSTEE AND SEQUESTRATION OF CASH COLLATERAL** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 7, 2010** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

   * Russell Clementson    russell.clementson@usdoj.gov
   * Monica Y Kim    myk@lnbrb.com
   * Monica Y Kim    myk@lnbyb.com
   * Elan S Levey    elevey@laklawyers.com, lgreenstein@laklawyers.com;rfeldon@laklawyers.com
   * Sam S Oh    sam.oh@limruger.com, julie.yu@limruger.com;amy.lee@limruger.com
   * Lindsey L Smith    lls@lnbrb.com
   * United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
   * Helen H Yang    hyang@ssd.com    ☐ Service information continued on attached page

**II.    SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On  **September 7, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**VIA OVERNIGHT MAIL**
see attached service list    ☒ Service information continued on attached page

**III.    SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 7, 2010** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.
**VIA ATTORNEY MESSENGER**
Hon. Richard Neiter
U.S. BANKRUPTCY COURT
255 E. Temple Street, Ctrm 1645
Los Angeles, CA  90012    ☐ Service information continued on attached page
I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

| September 7, 2010 | Angela Antonio | /s/ Angela Antonio |
|---|---|---|
| Date | Type Name | Signature |

1

In re Selim America, Inc.
In re Selim Textile, Inc.
Case No. 2:10-bk-45503-RN
Case No. 2:10-bk-45505-RN
MML

**SERVED VIA OVERNIGHT MAIL OR NEF**
(*)

SELIM TEXTILE, INC.
Attn: June Yong Kim
725 S. Figueroa Street, Suite 3070
Los Angeles, CA 90017

SELIM AMERICA, INC.
Attn: June Yong Kim
725 S. Figueroa Street, Suite 3070
Los Angeles, CA 90017

Monica Y. Kim *
Levene, Neale, Bender, Yoo & Brill LLP
10250 Constellation Blvd.
Suite 1700
Los Angeles, CA 90067

U.S. Trustee *
Ernst & Young Plaza
725 S. Figueroa Street, 26th Floor
Los Angeles, CA 90017

EYP Realty LLC
725 S. Figueroa Street, Suite 1850
Los Angeles, CA 90017

Internal Revenue Service
P.O. Box 21126
Philadelphia, PA 19114

Keystone Textile
2541 S. Alameda Street
Los Angeles, CA 90058

New York State Dept of Tax/Finance
ATT: Office of Counsel
Building 9, W.A. Harriman Campus
Albany, NY 12227

Sang Hee Yoon
1437 Wildwood Drive
Los Angeles, CA 90041

Selim Textile, Inc.
725 S. Figueroa Street, Suite 3070
Los Angeles, CA 90017

Susan Kang
17320 Larisa Drive
Cerritos, CA 90703

Aceco Korea Corp
RM 906 Jungwood B/D
13-25 Yoido-Dong Youngdeungpo-Ku
Seoul KOREA,

Frontier Logistics Services
1700 N. Alameda St.
Compton, CA 90222

H.S. USA INC.
JULIE YANG, Agent, c/o Fenwick West
801 CALIFORNIA STREET
Mountain View, CA 94041

Hwaseung Networks America Corp.
485 Seventh Avenue, Suite 309
New York, NY 10018

ILSHIN SPINNING CO, LTD.
15-15 Yoido-Dong
Yongdeungpo-Ku
Seoul  KOREA,

Joong Jay Shin
358 5th Avenue, Suite 301
New York, NY 10001

UNI GLOBAL LOGISTICS
1971 W. 190th Street, Ste. 150
Torrance, CA 90504

Unico Logistics Co.,Ltd.
9TH FL, KUKJE BLDG, 111
DA-DONG, CHUNG-GU
Seoul KOREA,