1 | TIMOTHY J. YOO (SBN 155531)
2 | MONICA Y. KIM (SBN 180139)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3 | 10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
4 | Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
5 |
6 | Proposed Attorneys for Chapter 11 Debtors and Debtors in Possession

7 |

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**(LOS ANGELES DIVISION)**

| | |
|---|---|
| In re: | )  CASE NO. 2:10-bk-45503-RN |
| | )  CASE NO. 2:10-bk-45505-RN |
| SELIM AMERICA, INC. | ) |
| | )  Chapter 11 |
|     Debtor. | ) |
| _____ | )  **DECLARATION OF JUNE YONG** |
| | )  **KIM IN SUPPORT OF DEBTORS'** |
| SELIM TEXTILE, INC. | )  **SUPPLEMENTAL OBJECTION TO** |
| | )  **EMERGENCY MOTION FILED BY** |
|     Debtor. | )  **HWASEUNG    NETWORKS** |
| _____ | )  **AMERICA,      CORP.      FOR** |
| | )  **APPOINTMENT   OF   CHAPTER   11** |
| ☒ Affects Both Debtors | )  **TRUSTEE   AND   SEQUESTRATION** |
| | )  **OF CASH COLLATERAL** |
| ☐ Affects Selim America, Inc. only | ) |
| | )  Date:  September 15, 2010 |
| ☐ Affects Selim Textile Inc. only | )  Time:  10:00 a.m. |
| | )  Place: Courtroom 1645 |
| | )       255 East Temple St. |
| | )       Los Angeles, CA |
| | ) |
| | ) |
| | ) |
| | ) |

I, June Yong Kim, hereby declare as follows:

1.    I am the sole shareholder, founder and President of Selim America, Inc. ("Selim") and Selim Textile, Inc. ("Textile"), the debtors and debtors in possession herein (collectively, the "Debtors").  I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2.    As the sole shareholder, founder and President of the Debtors, I manage the day to day business affairs and operations of the Debtors and maintain the books and records of the Debtors.  I am in charge of purchasing goods from suppliers, hiring vendors, sale of goods  to customers, collection of accounts receivable and payment of accounts payable.  Immediately prior to the Petition Date, in addition to myself, America had two employees.   Shortly after the Petition Date, America terminated Susan Kang as the manager.  Therefore, America only has two employees currently.  Textile has no employees.

3.    On August 23, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Following the Petition Date, the Debtors continue to operate their business and manage their affairs as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.    I started the business of the Debtors in 2006 with Textile.  Textile was established on April 24, 2006, as reflected by the Certificate of Incorporation from the State of New York, a copy of which is attached hereto as Exhibit "1".  I established America on November 2, 2007.  Attached hereto as Exhibit "2" is the Certificate of Incorporation for America from the State of New York.

5.     Generally, the Debtors are engaged in the business of importing various textile goods (e.g., yarns and fabrics) from foreign suppliers, and re-selling those goods to domestic customers.   During the approximately four years during which I have operated this business, I have cultivated extensive relationships with vendors, suppliers and customers.   Without these connections, the Debtors cannot continue to stay in business.  Prior to 2008, Textile did not buy any product from Hwaseung.

6.     In or about July 2008, after both Textile and America had been created, I began a business relationship with Hwaseung, which had started a business in the State of New York at or around the same time as a subsidiary or division of its Korean company (Hwaseung Group).   Prior to this time, Hwaseung had never engaged in the yarn and fabric business and had no experience in the yarn and fabric business.   The CEO of Hwaseung is Lee and the Chief Financial Officer ("CFO") of Hwaseung is Cho Young Dong ("Cho").   These individuals were my primary contacts at Hwaseung.  I was told by Lee and Cho that Hwaseung was established in the United States to serve as one of the main outlets for the exports of its Korean company because the Korean company was seeking to aggressively expand and increase exports.

7.     At the beginning of the business relationship, Lee and Cho told and made it very clear to me that, in order for Hwaseung and its executives to be perceived as being a success to its bosses who are located in Korea, they needed to show to these bosses that they had an enormous sales volume because it was critical to the Korean company to increase exports of its goods out of Korea.  Attached hereto as Exhibit "3" is an article published in Newsworld which highlights the rapid growth of Hwaseung Group.   Therefore, it was incredibly important for Textile to buy a large amount of good

from Hwaseung.  In response, and having had experience in the marketplace, I advised Lee and Cho that it was not possible to achieve high sales **and** high margin-profits.  In other words, if Textile must buy a lot, and, therefore, must sell a lot to its customers quickly, it would have to charge its customers prices which are much lower than what competitors would charge, possibly even below cost.  Lee and Cho understood this, but nonetheless emphasized to me that sales were what mattered the most, and that having arrearages by Textile would be an acceptable risk for Hwaseung because it needed to have rapid sales growth.

8.     While I did not like the idea of the Debtors losing money and being unprofitable, given Hwaseung's push for me to buy an enormous amount of goods and the informal nature of the parties' relationship, I fully expected that I would sustain a very long-term buying relationship with Hwaseung.  Therefore, while the parties would lose money during the early phase of their growth period, I expected that, once the companies established a presence and footing in the marketplace by securing a certain market share of the industry, that their losses would be reduced, and that ultimately, the parties would become profitable.   I had understood, based on my conversations with Lee and Cho, that Lee and Cho shared these views.

9.     During at least the first 1 and 1/2 years of our relationship, the terms upon which Hwaseung sold goods to the Debtors were never memorialized in writing including repayment terms.  Indeed, until January 2010, the parties had no agreement in place and all of the transactions were conducted orally.   In his declaration filed in support of the Motion, Cho states that "… (iii) Selim Textile would use the proceeds of such sale to pay Hwaseung within 90 days following the sale and delivery of thee goods

by Hwaseung to Selim Textile, minus a commission fee of 6%; and (iv)  Selim Textile

would also locate factors to guarantee the outstanding account receivables owing by

Selim Textile's customers for a commission fee ranging from 2%-6%." See Motion, p. 5.

lines 9-14.   But, this is not true.  Prior to January 2010, there was no agreement as to

repayment terms.  In January 2010, Textile signed agreements, but they don't purport to

provide for what Cho claims.  Rather, on Schedule A of the Revolving Sales Credit

Agreement which is attached as Exhibit A to the Cho Declaration, it states as the

repayment schedule, "*outstanding invoice due 150 days after Delivery of goods*."

Nothing is mentioned of any commissions.

10.    Generally, the transit of goods to the Debtors and payments to Hwaseung

occurred as follows.  The Korean parent would export container of textile goods into the

United States via Hwaseung, and in connection therewith, would issue bills of lading

(the "Korea Bills of Lading").  Once the goods were received by Hwaseung, Lee and/or

Cho would simply telephone me and instruct me to purchase all or a designated number

of the containers from Hwaseung.  Prices were not discussed.  Payment terms were not

discussed.  Purchase orders were never issued.  Invoices were never issued.  No bills of

lading were issued.  However, at the time the business relationship started, Lee made it

clear to me that he expected the Debtors to make "kickback" payments personally to Lee

which Lee would use to pay for vacations, shopping, expensive meals and entertainment,

and the like.  To my knowledge, Lee had the final authority in determining whether or

not to release goods to the Debtors.  Initially, Lee asked for "kickback" payments and

gifts equal to 3% of the total gross amount of goods shipped every month.  When I

refused this as being excessively high, Lee settled on receiving .5% of the total gross

amount of goods shipped every month.  While I did not like the idea of having to make these personal "kickback" payments, it was made clear to me by Lee that the Debtors would not receive any product from Hwaseung absent these "kickback" payments. These payments were made several times per month and were in the form of cash or check.   Over the duration of the parties' business relationship, the Debtors are likely to have paid over $500,000 in these "kickbacks" to Lee.  Given the Debtors' financial problems, I attempted to stop payment of these "kickbacks" in January and February 2010.  Again, Lee made it clear to me that, absent continuing "kickbacks," he would not send any additional goods to the Debtors. I brought these "kickback" payments to the attention of Young Rip Ko, the Chairman of Hwaseung Group, however the practice  of insisting on these payments did not stop.  The last "kickback" payment was made in June 2010 for $20,000.  A copy of this payment and copies of other checks issued by the Debtors to Lee are attached hereto as <u>Exhibit "4"</u>.  The Debtors are in the process of pulling all of the checks and other documents evidencing these payments.

11.    As evidenced by the checks attached hereto as <u>Exhibit "4"</u>, "kickback" payments were made by checks under the name "Selim America" and "Selim Textile" prior to March 2010.  Indeed, there is payment to Lee dated January 8, 2010 in the amount of $100,000 which was paid to him through a "Selim America" check.  Therefore, the allegation that Hwaseung was not aware of America's existence until March 2010 is entirely false.  In fact, America was set up in November 2007 even before the Debtors started doing business with Hwaseung and I never concealed the existence of America from Hwaseung.  Hwaseung knew that America had an office in Los Angeles, CA while Textile maintained an office in New York, NY.   Even Cho states in his

1   declaration that, shortly after the loan agreements were executed (which was in January

2   2010), he visited the Los Angeles, CA office of the Debtors which was America's

3   business premises.  See Cho Declaration, p. 3, lines 12-13.  Indeed, even from the start

4   of the business relationship, Lee and Cho suggested to me that I set up lots of

5   corporations to spread out the assets amongst the various companies.

6

7       12.    Once Textile received the instruction on the purchase of the goods, it sold

8   the same goods to America.  America then sold the goods to its customers (thereby

9   generating accounts receivable), and upon receipt of payments on the accounts

10  receivable, paid its debts, including debts owed to its affiliate Textile.  Textile, in turn,

11  repaid its debts to its creditors, such as Hwaseung.  There was no regularity to dates on

12  which Textile rendered payments to Hwaseung, or with regard to the payment amounts.

13  Rather, as I received payments from customers, I determined what amount I could afford

14  to pay, and rendered the payments to Hwaseung.  Payments occurred either through

15  Selim Textile check, Selim America check or via wire transfers.  Hwaseung never

16  questioned, inquired or complained about the amounts received or the frequency of the

17  payments until approximately July 2010.  The June 2009 bank statement of Textile,

18  which is attached hereto as Exhibit "5" provides a flavor of the payments made by the

19  Debtors to Hwaseung.  In that month, there were approximately six wires in the amounts

20  of $200,000 (on 6/12), $12,000 (on 6/15), $300,000 (on 6/16), $200,000 (on 6/18),

21  $100,000 (on 6/22) and $17,835 (on 6/26) and two additional checks cleared during that

22  month totaling another $400,000.  Indeed, the Debtors paid to Hwaseung approximately

23  $5 million in June 2010, $6 million in July 2010 and $2 million for the period from

24  August 1, 2010 to August 13, 2010.

25

26

27

28

13.     The Debtors and Hwaseung operated in this manner for approximately two years from July 2008 through July 2010.  By then, and as a result of America having to sell their inventory at or below the cost allegedly booked by Hwaseung, which was a practice known to and expected by Hwaseung, Textile's indebtedness to Hwaseung increased.

14.     In January 2010, Hwaseung had its legal counsel prepare loan agreements for me to sign on behalf of Textile.  I am Korean, and English is not my native language.  I am not fluent in English.  I was not given a chance to hire legal counsel to review these agreements, and was not given an opportunity to even read the agreements.  Frankly, even if I had read the agreement, I would not have understood what I was signing.  In addition, Hwaseung presented a lot of papers for me to sign, including in some cases, orphan signature pages.  With regard to certain of the agreements such as the Security Agreement, it appears that the signatures were altered (i.e., cut and pasted into the agreement by using a signature from a different document).  Because I did not really know what to do and was given no time or opportunity to think about these documents, I provided signatures to all or some of the agreements.  The signature pages have no signatures of witnesses, and are not notorized although the documents purport to have required notary acknowledgments.  I was never given fully executed copies of these agreements.  Given these defects and the circumstances under which they were signed (if signed at all), I now question whether these documents and agreements are valid and enforceable at all.

15.     In my view, the January 2010 loan agreements which go to extending sales credit of up to $30 million to Textile clearly evidence Hwaseung's knowledge and

expectation of the losses that the Debtors would sustain as a result of Hwaseung's "dumping" of goods upon the Debtors.  After Hwaseung obtained the January 2010 loan agreements for sales credit up to $30 million, it continued to "dump" goods upon the Debtors and the parties continued to do business in the same manner as they were previously handled.   In fact, the Promissory Note which is attached as Exhibit B to the Cho Declaration expressly requires the Debtors to purchase textile and fabrics from Hwaseung exclusively even if the Debtors end up owing $30 million to Hwaseung:

> *"The Promisor agrees that as consideration for Promisee to enter into this Promissory Note and Revolving Sales Credit, Promisor will only purchase Textiles and Fabrics from Promisee exclusively.  This covenant shall continue in duration so long as this Promissory Note and Revolving Sales Credit Agreement is in full force and effect."*

16.    However, by July 2010, Hwaseung suddenly became enraged at the Debtors as a result of the growing receivable owed to it by Textile, which had been known to Hwaseung for a significant period of time.  In his declaration, Cho claims that "Hwaseung sent various correspondences to alert Selim Textile regarding the overdue balance, seeking immediate payment, but to no avail" (see Motion, p. 5, lines 16-18); however, no copies of the correspondence are provided.  Indeed, such a statement is false because I never received any such letters or correspondence from Hwaseung.

17.    Suddenly, Hwaseung demanded that the Debtors execute different documents such as a Joint Sales Agreement which would have forced the Debtors to sell all of their assets and hand over all of the sale proceeds to Hwaseung without regard to the other creditors which assert senior liens upon the Debtors' assets as described below.  More specifically, approximately one day before filing the complaint in New York, Hwaseung tried to force me to sign the Joing Sales Agreement.  I was summoned to meet

with the following individuals: Jeffrey Jones (counsel for the parent company, Hwaseung Group), and Young Rip Ko, the Chairman of Hwaseung Group.  At the meeting, I was threatened with criminal prosecution unless I signed the document.  Indeed, in the document itself it states that Hwaseung would forgo its legal remedies including "the filing of … criminal complaints..."  I refused to sign the document Hwaseung had prepared despite their threat of sending me to prison if I did not sign.  A copy of this Joint Sales Agreement is attached hereto as <u>Exhibit "6"</u>.  Hwaseung also began to exercise "self-help" remedies, such as instructing the third party logistics company known as Frontier Logistics Services ("<u>Frontier</u>") used by the parties to stop shipping goods to America's customers, demanding that Frontier forward to Hwaseung all of the information and documents it had on the Debtors including confidential and proprietary customer information, and contacting (without any consent or notice to the Debtors) all of the Debtors' customers, suppliers, vendors and even employees to obtain information about the Debtors.

18.    Additionally, on August 23, 2010, Hwaseung filed a lawsuit in the United States District Court for the Southern District of New York against the Debtors, me, and other individual and corporate defendants.  Without ever having served the complaint on any of the defendants, Hwaseung proceeded to obtain a temporary restraining order on August 24, 2010, after the filing date of these cases.  As a result of these bankruptcy cases, I am advised that the provisions of that order are void as against the Debtors.  The non-debtor defendants and I have now retained counsel in that action and will be seeking to dismiss the RICO and other claims and/or filing counter claims against Hwaseung.  The Debtors have also commenced adversary proceedings against Hwaseung for

declaratory relief (as to the validity, priority and extent of lien and amount of claims), damages for intentional interference with contract, intentional interference with prospective economic advantage, and negligent interference with business relationships, (iii) damages for willful and intentional violation of the automatic stay; and (iv) permanent injunction.   The Debtors intend to amend the complaints to add claims for preferential transfers and to add employees of Hwaseung as additional defendants.

19.    Notwithstanding the filing of these cases, Hawseung has continued its bullying tactics of contacting the Debtors' vendors (including Frontier and the Debtors' other logistics and warehouse provider, Uni Global Logistics), its creditors (including Hana Financial, Inc. and Prime Business Credit, Inc.) and its customers and employees seeking information about the Debtors and me.  I am advised that these tactics constitute willful and intentional violations of the automatic stay provisions and the Debtors reserve all of their claims against Hwaseung and its employees, representatives and agents in this regard.

20.    For example, Susan Kang, a former manager of America, has not appeared at work since the filing date of August 23, 2010 and has not returned any messages that I have left for her.  As the manager, Kang possessed a lot of confidential customer and other business information, which was known only to me and Kang.  It is now apparent that Kang has been leaking customer and other business information to Hwaseung because Hwaseung has revealed that it knows the information which was previously known only to me and Kang.  Kang has also deleted all of the emails she sent and received during the approximately three weeks of August 2010.  The Debtors are in the process of obtaining the back-ups on these emails.

21.    Pre-petition, America and Prime Business Credit, Inc. ("Prime") entered into a non-borrowing factoring agreement whereby Prime essentially guaranteed the payment of certain accounts receivable assigned to it by America.  To secure America's obligations to Prime, America's assets are subject to a lien in favor of Prime which currently has a liquidated claim of approximately $3,000 and a contingent claim of approximately $372,000 arising from a letter of credit issued pre-petition to secure the obligations of America to a foreign supplier.  In addition, the assets of Textile are subject to a lien in favor of Industrial Bank of Korea, New York Branch ("IBK") which is senior to the purported lien of Hwaseung.  IBK was owed approximately $2.5 million as of the Petition Date, and, in addition to the liens against Textile's assets, Textile's indebtedness to IBK is secured by a pre-petition letter of credit in the amount of $2.2. million.

22.    Absent Chapter 11, it was clear that Hwaseung wanted to destroy the Debtors' business and seize all of the Debtors' assets, without any notice to Prime (which has a senior and only lien on America's assets) and to IBK (which has a lien senior to any purported lien of Hwaseung).  The Joint Sales Agreement is an example of Hwaseung's intentions.  Additionally, I learned, based on discussions with counsel, that there might be problems with the status of the lien asserted by Hwaseung given the circumstances surrounding the loan agreements and the signing thereof, the defects in the financing statement, and the extent of control exercised by Hwaseung upon the Debtors. In order to prevent the seizure of all of their assets from Hwaseung's reach, I filed these cases on an emergency basis.

23.    Clearly, Hwseung's motive behind the Motion is not to protect these estates from me.  Rather, the eliminating me rom the business kills the Debtors, which

allows for Hwaseung to take over the Debtor's customers which Hwaseung has already started to do based on confidential information diligently and illegally obtained by Hwaseung from third party sources.  If Hwaseung was truly interested in the truth and preserving the business for the benefit of all creditors, it should have suggested the employment of an independent forensic accountant to investigate the Debtors' prior transactions as the Debtors are now suggesting, without attempting to "push the Debtors off the ledge" by getting rid of me who the Debtors cannot operate without.   I don't have any problem with the Court's employment of an independent forensic accountant to investigate the Debtors' prior transactions should it deem necessary or prudent under the circumstances of this case.   The Debtors will give the accountant full and complete access to all of their books and records, so that s/he can investigate all transactions and payments, including any and all payments received by me and Lee.

24.    The Debtors have obtained an extension of time to file their schedules of assets and liabilities through September 23, 2010.  However, the Debtors have already identified the key assets of these estates, which are listed in Exhibit "7" attached hereto.[1] As identified therein, I acknowledge that I personally received loans from the Debtors, and that the Debtors' funds were used to pay for certain personal and real property taken under my personal name such as vehicles.  However, all of these transactions will be disclosed in the schedules and statements of financial affairs, and, if necessary, the estates can and will hire special counsel to ensure that the estates' claims against me are

---

[1] This information was originally prepared and provided to Hwaseung and its counsel in connection with confidential settlement discussions protected under Rule 408 of the Federal Rules of Evidence.  In breach of Rule 408, counsel for Hwaseung delivered the information to the Office of the United States Trustee.

1   preserved and prosecuted.  In any event, all of these payments and loans will be revealed

2   to and investigated by the independent forensic accountant if one is deemed to be

3   necessary by the Court.

4

5       25.    The sole basis of the allegations is that the Debtors "fraudulently

6   transferred and concealed" assets relate to the approximately $59 million claim that

7   Hwaseung alleges is owed to it by Textile.  The Debtors dispute the claim of $59

8   million.  Despite knowing the answer, Hwaseung asks "[w]hat happened to the $59

9   million worth of unpaid inventory that Hwaseung sold to Selim Textile?"  See Motion, p.

10  4, lines 11-12.  The simple answer is the following.

11

12      26.    As of the filing date of the Debtors' cases, America had inventory with a

13  market value of approximately $12 million and accounts receivable of approximately

14  $8.8 million, for a total of approximately $21 million.  Based on Hwaseung's math, the

15  difference between its purported claim of $59 million, minus the value of America's

16  assets, equals the cash allegedly diverted by me.  However, that does not reflect the

17  reality of the parties' relationship which is described above whereby Hwaseung dumped

18  goods upon the Debtors, and, as a result, the Debtors were forced (as Hwaseung was

19  fully aware) to sell the goods at lower prices, including at below the prices charged by

20  Hwaseung (which was never negotiated by the parties).  As a result, the Debtors suffered

21  tremendous losses, which, over time, I believed would be reduced.  With longevity, the

22  Debtors expected that they and Hwaseung would have established themselves in the

23  marketplace, and ultimately make profits from their businesses.  In the meantime, I do

24  not dispute that some of the Debtors' revenue was used to cover loans to, and purchases

25  for, me, for which the estates have claims against me for approximately $1.5 to $2

26

27

28

million.  Some of the Debtors' revenue was also used to fund "kickback" payments to Lee in excess of $500,000.  However, the bulk of Textile's unpaid balance to Hwaseung is simply the losses associated with the Debtors having had to sell its goods at below what was being charged by Hwaseung (which was never subject to any negotiations) in order to meet the demands of Hwaseung to buy all or most of the goods exported from Korea.  Selling at or below what Hwaseung charged the Debtors was not a crime or fraud.

27.     I have not committed any RICO violations, fraud, fraudulent transfers, concealment of the Debtors' assets, conversion or conspiracy to default.     As aforementioned, the Debtors are fully prepared to employ a forensic accountant to investigate all of their books and records to determine whether any fraud has occurred. The Debtors and I will fully cooperate with the accountant's duties and tasks, and his or her report can be submitted directly to the Court.

28.     Hwaseung claims that I "repeatedly" informed Hwaseung that $49 million of Textile's accounts were guaranteed by Prime.  Hwaseung also makes the claim that I "forged" AR summaries.  These allegations are not true, and there is absolutely no basis for such accusations.

29.     Prior to the pre-petition factoring agreement between Prime and America, Textile explored the idea of entering into a factoring agreement with Prime.   However, a final agreement never materialized, and I never represented to anyone at Hwaseung, let alone "repeatedly," that Prime guaranteed any accounts of Textile.  Hwaseung also apparently never bothered to independently confirm the relationship between Prime and

the Debtors despite having been owed almost $50 million at the time it claims that I lied about the Prime-Textile relationship.

30.    With regard to AR summaries, I never forged any documents or made any phony documents.  In Hwseung's world – a world in which it never invoiced Textile for any goods – Hwaseung determined that the total amount owed to it by Textile would be the same or higher amount than what Hwaseung was charged by its Korean exporting parent company, as reflected in the Korea Bills of Lading.  Hwaseung also knew that it was impossible for the Debtors to sell all of the goods "dumped" on it by Hwaseung to its customers at prices equal to or higher than what the Debtors were being charged by Hwaseung.  Therefore, the Debtors would suffer losses.

31.    Notwithstanding this reality which Hwseung was clearly aware of, Hwaseung insisted that I give to Hwseung the Debtors' customer invoice information ***as they correlate to Textile's outstanding indebtedness to Hwaseung*** (which was inflated due to the losses that Hwaseung knew of at all times).  I simply complied with Hwaseung's requests, but now is unfairly being accused of having forged or of having made phony documents.  The accusations are completely and wholly baseless.

32.    Remarkably, Hwaseung claims that I am in breach of my fiduciary obligations to the estates by having demanded that Frontier, which was holding over $10 million of the estates' inventory as of the Petition Date (but owed only approximately $2.4 million for unpaid, pre-petition fees) immediately turn over property of the estates.  See Motion, p. 4, lines 26-28.  Clearly, Hwaseung is upset that Frontier was required by the Bankruptcy Code to surrender estate property to the debtors in possession, and, as a result, its ability to seize such goods have weakened.

33.    Indeed, even counsel for Frontier, the law firm of Squire Sanders, agreed that, even though Frontier asserts a warehouseman's lien upon the goods in its possession, in light of Chapter 11, there was no legal basis for Frontier to hold over $10 million of inventory hostage.  As a result, shortly after the Debtors' bankruptcy counsel got in touch with Frontier's counsel, Frontier released all of the inventory with the exception of $2.5 million worth of inventory (the "<u>Holdback Inventory</u>").  Additionally, the parties entered into adequate protection stipulations with regard to the Holdback Inventory, which have been approved by the Court.   Therefore, Hwaseung's argument that I am not acting within his fiduciary obligations by asking the third party warehouse to turn over property of the estates is nonsensical.

34.    I am advised that the purported lien of Hwaseung appears very problematic.

35.    The Security Agreement which is attached as Exhibit C to the Cho Declaration is a five page agreement.  Oddly, there is a significant amount of space between the end of the narrative of the agreement and the signature line for me.  While I (and keeping in mind that I am not a native English speaker or reader) recall signing various documents in January 2010, since I was never given the opportunity to consult with counsel, it is possible that I did not sign the Security Agreement.  The 6th page of the Security Agreement provides for a notary signature, but none exists.

36.    Even assuming the Security Agreement is valid, under the agreement, *Textile* purported to grant to Hwaseung a security interest and lien upon the following:

> "A.    All equipment, fixture, furniture, leasehold improvement, lease, stock, supply, inventory goods, contractual rights, chattel paper, trade name, trade good now and hereafter to be acquired by Selim Textiles,

1    Inc. for the premises at 358 5th Ave., Suite 3021, New York, New York
2    and wherever they may be located.

3    B.    All the outstanding shares of Selim Textiles Inc. held by June
4    Yong Kim.

5    C.    All the Outstanding account receivables existing at the time of
6    declaration of default by the Secured Party."

7    37.    Hwaseung purported to record a UCC financing statement with the Office

8    of the Secretary of State of New York on May 26, 2009, underlined approximately six months

9    before the Security Agreement.    Additionally, the description of the collateral

10    purportedly covered by the UCC financing statement is very *different* from the

11

12    description of the collateral set forth in the Security Agreement.    The UCC financing

13    statement describes the collateral simply as:

14

15    "All equipment, fixture, furniture, leasehold improvement, lease, stock,
      supply, inventory goods, contractual rights, chattel paper, trade name,
16    trade good now and hereafter to be acquired by Selim Textiles, Inc. for
      the premises at 358 5th Ave., Suite 3021, New York, New York 1001
17    (See the Exhibit A).    THE FINANCING STATEMENT IS EFFECTIVE
      UNTIL TERMINATION."
18

19    There is no Exhibit A attached to the UCC financing statement recorded by Hwaseung

20    with the Office of the Secretary of State of New York despite the language of the

21

22    financing statement.    Also, the description of the collateral in the financing statement

23    appears to limit the collateral to those items described which are located in New York.

24    38.    The financing statement also identifies the debtor as Selim Textiles, Inc.

25    which is not the correct name of Textile.

26

27    39.    Additionally, as mentioned above, based on the magnitude and scope of

28    the instructions given to the Debtors, I am advised that Hwaseung may constitute an

"insider" of the estates.  If deemed to be an "insider," then I am advised that the granting of the security interest, as well as all of the payments received by Hwaseung, Lee and anyone associated with Hwaseung during the one year period prior to the Petition Date could be voided as preferential transfers.  Therefore, Hwaseung may not be a secured creditor of Textile at all.

40.    Hwaseung surmises, without any evidence, that I may be a shareholder of Keystone Textiles, Inc. ("Keystone"), which is a customer of America.  However, I am not a shareholder of Keystone.  Hwaseung further surmises, again without any evidence, that the Debtors sold goods to Keystone at below market prices and received cash kickbacks.  However, this is also false.  While it is no secret that I am friendly and have a very amicable business relationship with the principal of Keystone, the Debtors have not shown as special favors for Keystone.  An investigation by the forensic accountant would verify this.

41.    I am  however a shareholder of Globiz Clothing, Inc. ("Globiz").  I am a Korean national, who resides in the United States pursuant to an E-2 visa.  In order to obtain this visa, it was necessary for me to make an investment in the United States, which I did by investing the sum of $150,000 to Globiz.  I used the funds that I obtained as loans from America as reflected in Exhibit "7" attached hereto to make this investment.  However, on or about December 12, 2009, I repaid the loan to America.  Again, an investigation by the forensic accountant would verify this.

42.    In the alternative to the appointment of a trustee and without making the appropriate showing, I am advised that Hwaseung essentially seeks an injunction prohibiting the Debtors from "using, selling or leasing" any property of the Debtors'

estates or imposing conditions on any sale of inventory, and asking for a declaration of "all inventory furnished by Hwaseung to the Debtors from January 1, 2010 to the present."   Additionally, Hwaseung wants the Debtors to "sequester" cash collateral, without specifying what that even means.

43.   The Debtors have filed a motion for authority to use cash collateral asking for Court authority to use their revenue to pay the basic expenses of the companies which must be paid to avoid irreparable harm to the companies.  These expenses boil down to purchase of goods, and payment of warehouse and freight fees, factor fees, rent, utilities, payroll, office supplies, parking and meals.  The Court has not yet approved this motion, and, if approved, the Debtors will spend their cash only as authorized by the Court.

44.   All other post-petition funds will remain in the debtor in possession general bank account opened by America (the "DIP Account").  Post-petition, Hwaseung demanded that counsel for the Debtors send to all customers a letter instructing them to wire all post-petition payments into the DIP bank account.   Rather, counsel for the Debtors have agreed to send letters to the Debtors' customers indicating that all post-petition payments should be made by check and sent to counsel for the Debtors.  Counsel for the Debtors will then send the checks to me for deposit into the DIP bank account. Given this, there is no need to "sequester" any cash in these cases.

45.   The request that the Debtors simply not sell any goods during these cases or impose conditions regarding sales in these cases is absurd, and further reinforces Hwaseung's motives to hurt the Debtors' business for its own financial gains.  Such a request would also result in the shut down of the Debtors' business within the first three

1  weeks of the cases and rob other creditors of these estates from maximizing their

2  recoveries in these cases.  There is no basis for granting the relief requested.

3       **I declare under penalty of perjury that the foregoing is true and correct.**

4

5       Executed this 7th day of September 2010 at Los Angeles, California.

6

7



8                    JUNE YONG KIM

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**

*State of New York    }*
                          *ss:*
*Department of State }*


*I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary
of State and that the same is a true copy of said original.*

*Witness my hand and seal of the Department of State on*          **May 16, 2006**



                                                          *Special Deputy Secretary of State*

DOS-1266 (Rev. 11/05)

CERTIFICATE OF INCORPORATION

OF

SELIM TEXTILE, INC. **060424000** 02

Under Section 402 of the Business Corporation Law


        The undersigned, being a natural person and at least
eighteen years of age, desiring to form a business corporation
pursuant to the Business Corporation Law of the State
of New York, does hereby certify and set forth as follows:


        (1)    The name of the corporation is:

                SELIM TEXTILE, INC.

        (2)    The purpose or purposes for which this corporation
is organized are as follows, to wit:

        The purpose of the corporation is to engage in any lawful
act or activity for which corporations may be organized under the
Business Corporation Law, provided that the corporation is not
formed to engage in any act or activity which requires the consent
or approval of any state official, department, board, agency or
other body.


        For the accomplishment of the aforesaid purposes, and in
furtherance thereof, the corporation shall have, and may exercise,
all of the powers conferred by the Business Corporation Law upon
corporations formed thereunder, subject to any limitations contained
in Article 2 of said law or in accordance with the provisions of any
other statute of the State of New York.


        To acquire property, real and personal, as may be necessary
to the conduct of such business.


        (3)    The office of the corporation is to be located in the
County of New York, State of New York.

*1*

(4)  The aggregate number of shares which the corporation shall have authority to issue is:

Two Hundred (200) Shares Without Par Value

(5)  The Secretary of State is designated as agent of the corporation upon whom process against it may be served. The post office address to which the Secretary of State shall mail a copy of any process against the corporation served upon him is:

June Yong Kim
358 5th Avenue
Suite 301
New York, NY 10001

(6)  The corporation shall, to the fullest extent permitted by Articles 7 of the Business Corporation Law of the State of New York, as the same may be amended and supplemented, indemnify any and all persons whom it shall have power to indemnify under said Article from and against any and all of the expenses, liabilities, or other matters referred to in or covered by said Article, and the indemnification provided for herein shall not be deemed exclusive of any other rights to which any person may be entitled under any By-Law, resolution of directors, agreement, or otherwise, as permitted by said Article, as to action in any capacity in which he served at the request of the corporation.

The personal liability of the directors of the corporation is eliminated to the fullest extent permitted by the provisions of paragraph (b) of Section 402 of the Business Corporation Law of the State of New York, as the same may be amended and supplemented.

IN WITNESS WHEREOF, this certificate has been subscribed this 21st day of April, 2006 by the undersigned, who affirms that the statements made herein are true under the penalties of perjury.

Robert Worthington, Incorporator
2021 Arch Street
Philadelphia, PA 19103

2



CERTIFICATE OF INCORPORATION

OF

SELIM TEXTILE, INC.

Under Section 402 of the Business Corporation Law
of the State of New York

I CC

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED  APR 2 4 2006.

TAX S. _____
BY: _____

Filer: M. BURR KEIM COMPANY
       2021 Arch Street
       Philadelphia, PA 19103

Cust. Ref # 15069

DRAWDOWN

3

012

**EXHIBIT 2**

# *STATE OF NEW YORK*

## *DEPARTMENT OF STATE*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and the official seal of the Department of State, at the City of Albany, on November 6, 2007.

Paul LaPointe
Special Deputy Secretary of State

Rev. 06/07

**071102000367**

OPAL ID: 467774

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
Albany, NY 12231

(This form must be printed or typed in black ink)

# CERTIFICATE OF INCORPORATION
# OF

SELIM AMERICA Inc.
*(Insert corporate name)*

Under Section 402 of the Business Corporation Law

**FIRST:** The name of the corporation is:   SELIM AMERICA Inc.

**SECOND:** This corporation is formed to engage in any lawful act or activity for which a corporation may be organized under the Business Corporation Law, provided that it is not formed to engage in any act or activity requiring the consent or approval of any state official, department, board, agency or other body without such consent or approval first being obtained.

**THIRD:** The county, within this state, in which the office of the corporation is to be located is:  New York

**FOURTH:** The total number of shares which the corporation shall have authority to issue and a statement of the par value of each share or a statement that the shares are without par value are: 200 No Par Value

**FIFTH:** The Secretary of State is designated as agent of the corporation upon whom process against the corporation may be served. The address to which the Secretary of State shall mail a copy of any process accepted on behalf of the corporation is:

JUNE YONG KIM

358 5TH AVENUE, SUITE 301

NEW YORK , NY   10001   USA

0711020003̶6̶7̶

OPALID: 467774

# Incorporator Information Required

X KWANGHO LEE

*(Signature)*

KWANGHO LEE

*(Type or print name)*

1270 BROADWAY, SUITE 205

*(Address)*

NEW YORK , NY  10001  USA

*(City, State, Zip code, and Country)*

STATE OF NEW YORK
DEPARTMENT OF STATE

# CERTIFICATE OF INCORPORATION

## OF

SELIM AMERICA Inc.

*(Insert corporate name)*

Under Section 402 of the Business Corporation Law

2007 NOV -2 AM 11: 14

FILED NOV 0 2 2007

TAX:

New York

Filed by:  KWANGHO LEE

*(Name)*

1270 BROADWAY, SUITE 205

*(Mailing address)*

NEW YORK , NY  10001  USA

*(City, State, Zip code, and Country)*

Note: This online form was prepared by the NYS Department of State and the NYS Governor's Office of Regulatory Reform for filing a certificate of incorporation for a business corporation. It does not contain all option provisions under the law. You are not required to use this from.

You may draft you own form or use forms available at legal stationery stores. The Department of State recommends that legal documents be prepared under the guidance of an attorney. The fee for a certificate of incorporation is $125 plus the applicable tax on shares required by Section 180 of the Tax Law. The minimum tax on shares is $10. The tax on 200 no par value shares is $10 (total $135) The certificate must be submitted with filing fee and applicable tax.

# EXHIBIT 3

# In Recognition of Brilliant Biz Leadership

**Chmn. Ko of Hwaseung Group wins gold medal for the rapid growth of the conglomerate**






HWASEUNG

Chairman Ko Young-rip of the Hwaseung Group won the Industrial Merit Gold Medal at the 37th Commerce-Industry Day on March 17 for his outstanding leadership in managing the conglomerate's rapid growth during its 53 years of operation.

The honor recognizes Chairman Ko's strong management style through the group's five decades-long history, which played a huge role in overcoming some dark moments in its operation.

Ko also has been cited for the group's social activities, which helped improve its image as a conglomerate, especially in the area of job creation when it was needed the most during the economic downturn.

The group had its share of management crises, like in 1998 when a number of its affiliates went belly up, but Ko led the group out of the crisis with his determined managerial policies, normalizing its operations in six years. The group's annual sales revenue quadrupled in the following year.

During the 1998 financial crisis, the group's annual sales amounted to 840 billion won, but it expanded to 2.6 trillion won last year and is projected to hit 3 trillion won this year. The fast rise in sales has been attributed to the group's global business operations and new growth engines that the group is pursuing.

Ko led the group to successfully operate in the footwear and auto parts production sectors around the world including the United States, China, Vietnam and India, among others.

The rapid expansion of the group has also been considered the result of diversified business operations from auto parts, high-tech materials, precision chemicals, natural resources trade through its global network and the expansion of footwear with the brand name Lecaf through the OEM system around the world under the group's selection and

concentration strategy.

Ko said that Hwaseung has been a leading business group for the past 10 years because of its segregated operational strategies, and this year sales would reach 3 trillion won and in 2020 they would hit 10 trillion won through a new vision that the group will soon announce.

The diversified nature of the group's businesses such as international trade and new materials, in addition to auto parts and sports fashion brand products, helped the group grow in such a rapid way.

Hwaseung Materials, which is building its plant in the Myungrei Industrial Complex in Kijang, Busan, at a cost of 500 billion won, is geared to raise its annual sales to 1.5 trillion won by 2020. The plant is attracting a lot of attention in the industry due to its high-tech production facilities and new materials to be produced at the plant as the group plans to build its future business strategies around new materials and the trade of natural resources.

The group also plans to expand its global network to Africa and South America in order to boost its global presence, as Ko said the group's global network will play a huge role in the group's future business operations.

The group has 22 affiliate firms including 14 in foreign countries such as the United States, China and India, among others.

Chairman Ko started his career at the bottom and rose to become CEO. He left many stories in his path as a salary man with a number of nicknames such as 'owl,' because he used to turn up at offices at night to see if things are going all right, and 'firefighter,' because he saved the affiliated firms that went belly-up.

His brilliant management of the group was said to have been the reason the group got out from under court management much earlier than scheduled on Jan. 10, 2005. His initiatives in picking brand name sports products such as Lecaf, K-Swiss and Murrel and managing them successfully enough to make them representative Korean sporting goods have been so highly appreciated not only in the business community, but also in official circles, that it was no accident that he won the gold medal from the government for his management record.

He was promoted to chairman from vice chairman and he engineered the M&As of 11 companies in 1997 with his brilliant leadership and innovative ideas to build the group's major business around such key business areas as auto parts production, sports fashion brands, precision chemicals and international trading under his "selective and concentrated" strategy. **nw**

**w(left) Chairman Ko Young-rip of Hwaseung Group. Chairman Ko receives the Industrial Merit Gold Medal from Prime Minister Chung Un-chan at the Commerce Industry Day ceremony on March 17.(right)**

Copyright(c) 2003 Newsworld All rights reserved. news@newsworld.co.kr
3Fl, 292-47, Shindang 6-dong, Chung-gu, Seoul, Korea 100-456
Tel : 82-2-2235-6114 / Fax : 82-2-2235-0799

# EXHIBIT 4



Personal → Wan Man Lee

2/6/0, 6/24

## Check Image

**Account Number: 4830 0307 5824**



Ref. No.: 813005992537161   Amount: 100,000.00



Ref. No.: 813006192528812   Amount: 100,000.00





## Check Image

**Account Number: 4830 0125 8517**







Ref. No.: 813007392376401    Amount: 15,000.00





Ref. No.: 813004670773017    Amount: 300,000.00



0000903

## Check Image - Continued

**Account Number: 4830 0125 8517**





Ref. No.: 813004570027965   Amount: 100,000.00







Ref. No.: 813006792108061   Amount: 15,000.00

## Check Image    Continued



Ref. No.: 813006092717294    Amount: 10,000.00







Ref. No.: 813006992272966    Amount: 15,000.00





**Check Image Continues on Next Page**

Selim Textile.

0000887

## Check Image



Ref. No.: 813006592540390   Amount: 30,000.00





## Check Image - Continued



Ref. No.: 813007492426872    Amount: 25,000.00





**Check Image Continues on Next Page**

000080

## Check Image

**Account Number: 4830 0125 8517**





Ref. No.: 813004470903846   Amount: 100,000.00





Ref. No.: 813006492016360   Amount: 10,000.00





Ref. No.: 813006492016359   Amount: 10,000.00

H

0000933

## Check Image Continued

**Account Number: 4830 0125 8517**

  

Ref. No.: 813006992439395   Amount: 10,000.00

  

Ref. No.: 813006992439394   Amount: 10,000.00

# EXHIBIT 5

H

## Bank of America 

Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

Page 1 of 11
Statement Period
06/01/09 through 06/30/09
E0  P PB  0B 60                    000104.

Account Number  4830 0125 8517

01487 001 SCM999 I1 3   0

SELIM TEXTILE, INC.
(OPERATING ACCOUNT)
358 5TH AVE RM 301
NEW YORK NY 10001-2228

Our free Online Banking service allows you to check balances, track account activity, pay bills and more.
With Online Banking you can also view up to 18 months of this statement online.
Enroll at www.bankofamerica.com/smallbusiness.

Customer Service Information
www.Bankofamerica.com

Deposit Accounts

## Business Advantage Checking

### SELIM TEXTILE, INC.  (OPERATING ACCOUNT)

#### Your Account at a Glance

| | | | |
|---|---|---|---|
| Account Number | 4830 0125 8517 | Statement Beginning Balance | $25,311.76 |
| Statement Period | 06/01/09 through 06/30/09 | Amount of Deposits/Credits | $2,361,152.24 |
| Number of Deposits/Credits | 20 | Amount of Withdrawals/Debits | $2,420,938.53 |
| Number of Withdrawals/Debits | 59 | Statement Ending Balance | $34,474.53- |
| Number of Deposited Items | 0 | | |
| Number of Days in Cycle | 30 | Average Ledger Balance | $63,297.28 |
| | | Service Charge | $0.00 |

H

SELIM TEXTILE, INC.
(OPERATING ACCOUNT)

Page 2 of 11
Statement Period
06/01/09 through 06/30/09
E0  P  PB  0B 60

Account Number  4830 0125 8517

## Your Business Advantage Pricing Relationship

| Account Name | Account Number | Qualifying Balance ($) | Type of Balance | Date |
|---|---|---|---|---|
| Business Advantage Checking | 4830 0125 8517 | 40,183.49 | Average | 06-29 |
| Business Economy Checking | 4830 0125 8520 | 811.58 | Average | 06-29 |
| | **Total Qualifying Balance** | **$40,995.07** | | |

Thank you for banking with us. With the balances in your accounts, there is no monthly maintenance fee for your Business Advantage account this month.

## Deposits and Credits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 06/02 | 300,000.00 | Online Banking transfer from Chk 5824 Confirmation# 6795384202 | 957306027565349 |
| 06/03 | 60,000.00 | Online Banking transfer from Chk 5824 Confirmation# 4705880939 | 957106037540548 |
| 06/04 | 3,000.00 | Online Banking transfer from Chk 5824 Confirmation# 1514832692 | 957206047529555 |
| 06/08 | 7,000.00 | Online Banking transfer from Chk 5824 Confirmation# 5329267834 | 957306087532274 |
| 06/09 | 30,000.00 | Online Banking transfer from Chk 5824 Confirmation# 1057100209 | 957206097558598 |
| 06/11 | 200,000.00 | Online Banking transfer from Chk 5824 Confirmation# 4174870946 | 957106117596499 |
| 06/12 | 43,000.00 | Online Banking transfer from Chk 5824 Confirmation# 4282767208 | 957106127580672 |
| 06/15 | 50,000.00 | Online Banking transfer from Chk 5824 Confirmation# 4291494311 | 957106157572057 |
| 06/16 | 255,000.00 | Online Banking transfer from Chk 5824 Confirmation# 4617079315 | 957106167549771 |
| 06/18 | 220,000.00 | Agent Assisted transfer from Chk 5824 Confirmation# 1335370169 | 956906187509962 |
| 06/19 | 150,000.00 | Online Banking transfer from Chk 5824 Confirmation# 5841872774 | 957306197543841 |
| 06/22 | 150,000.00 | Online Banking transfer from Chk 5824 Confirmation# 4768585972 | 957106227507523 |
| 06/24 | 10,000.00 | Online Banking transfer from Chk 5824 Confirmation# 4785839505 | 957106247546214 |
| 06/25 | 180,000.00 | Online Banking transfer from Chk 5824 Confirmation# 4894551980 | 957106257596784 |
| 06/29 | 103,152.24 | Return Of Posted Check / Item (Received On 06-26) Check #0000000610 | 955206260002384 |
| 06/29 | 100,000.00 | Online Banking transfer from Chk 5824 Confirmation# 4728922021 | 957106297517587 |
| 06/29 | 50,000.00 | Online Banking transfer from Chk 5824 Confirmation# 1610270447 | 957206297543150 |
| 06/30 | 150,000.00 | Return Of Posted Check / Item (Received On 06-29) Check #0000000616 | 955206290003451 |
| 06/30 | 150,000.00 | Return Of Posted Check / Item (Received On 06-29) Check #0000000617 | 955206290003452 |
| 06/30 | 150,000.00 | Online Banking transfer from Chk 5824 Confirmation# 1838072326 | 957206307574140 |



SELIM TEXTILE, INC.
(OPERATING ACCOUNT)

## Withdrawals and Debits
### Checks

| Check Number | Amount ($) | Date Posted | Bank Reference | Check Number | Amount ($) | Date Posted | Bank Reference |
|---|---|---|---|---|---|---|---|
| 594 | 15,000.00 | 06/03 | 813007392376401 | 611 | 239.50 | 06/25 | 813008492549102 |
| 595 | 300,000.00 | 06/03 | 813004670773017 | 612 | 1,713.08 | 06/25 | 813008492575419 |
| 596 | 969.16 | 06/18 | 813009092420434 | 613 | 3,258.95 | 06/30 | 813009392480769 |
| 597 | 2,952.00 | 06/03 | 813004370784962 | 614 | 100,000.00 | 06/29 | 813004670042205 |
| 598 | 781.98 | 06/08 | 813008592319225 | 616* | 150,000.00 | 06/29 | 813004670042203 |
| 599 | 500.00 | 06/08 | 813004870886668 | 617 | 150,000.00 | 06/29 | 813004670042204 |
| 600 | 62,348.82 | 06/05 | 813008192673699 | 618§§ | 50,000.00 | 06/30 | 813004670335530 |
| 601 | 40.01 | 06/09 | 813008792762115 | 620* | 2,952.00 | 06/26 | 813004870191051 |
| 602 | 2,600.00 | 06/08 | 813002282476591 | 621 | 781.98 | 06/30 | 813009192709851 |
| 603 | 967.58 | 06/18 | 813009092420433 | 1328* | 124.80 | 06/01 | 813008992741610 |
| 604 | 160,260.52 | 06/19 | 813009292284904 | 1329 | 50,000.00 | 06/15 | 813008092276421 |
| 605 | 112,304.11 | 06/25 | 813008492575420 | 1330 | 200.00 | 06/25 | 813008592009166 |
| 608* | 3,613.11 | 06/18 | 813009092174381 | 1331 | 2,000.00 | 06/25 | 813008492885416 |
| 609 | 500.00 | 06/24 | 813004870034747 | 1334* | 200.00 | 06/30 | 813009392028742 |
| 610 | 103,152.24 | 06/26 | 813007892834240 | 1335 | 2,000.00 | 06/30 | 813009392062473 |

* Gap in sequential check numbers.

### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 06/09 | 782.08 | Wfn  Pbp  Wfn      Des:Paybyphone ID:000000317305121 Indn:June Y Kim           Co ID:1133163498 Web | 900660002644661 |
| 06/12 | 200,000.00 | Wire Type:Wire Out Date:090612 Time:1418 Et Trn:2009061200201028 Service Ref:008006 Bnf:Hwaseung Networks America ID:7584-800-24847 Bnf Bk:Shinhan Bank ID:026011950 Pmt Det:010906120 03174Nn | 903706120201028 |
| 06/12 | 25.00 | Wire Transfer Fee | 903706120135608 |
| 06/15 | 14,000.00 | Wire Type:Intl Out Date:090615 Time:1648 Et Trn:2009061500285591 Service Ref:799113 Bnf:Unico Logistics Co, Ltd. ID:010Jsd1035732 Bnf Bk:Korea Exchange Bank ID:006290094519 Pmt Det:01090615011494Nn | 903706150285591 |
| 06/15 | 12,000.00 | Wire Type:Intl Out Date:090615 Time:1650 Et Trn:2009061500286563 Service Ref:799127 Bnf:Hwa Seung Networks, Co., L ID:650-005722-752 Bnf Bk:Korea Exchange Bank ID:006290094519 Pmt Det:01090615011600Nn | 903706150286563 |
| 06/15 | 120.00 | Capital One      Des:Online Pmt ID:916439910259606 Indn:7105768727Kim June Yon  Co ID:9279744991 Ccd | 900666003523252 |
| 06/15 | 88.70 | American Express Des:Web Remit  ID:090613061406707 Indn:June Y Kim           Co ID:1133133497 Web | 900666003741950 |
| 06/15 | 45.00 | Wire Transfer Fee | 903706150143152 |
| 06/15 | 45.00 | Wire Transfer Fee | 903706150143167 |
| 06/16 | 300,000.00 | Wire Type:Wire Out Date:090616 Time:1525 Et Trn:2009061600210059 Service Ref:007740 Bnf:Hwa Seung Networks America ID:7584-800-24847 Bnf Bk:Shinhan Bank ID:026011950 Pmt Det:010906160 07619Nn | 903706160210059 |
| 06/16 | 25.00 | Wire Transfer Fee | 903706160121296 |

Page 4 of 11
Statement Period
06/01/09 through 06/30/09
E0   P  PB   0B 60

Account Number  4830 0125 8517

SELIM TEXTILE, INC.
(OPERATING ACCOUNT)

## Withdrawals and Debits - Continued
### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 06/18 | 200,000.00 | Wire Type:Wire Out Date:090618 Time:1548 Et Trn:2009061800232317 Service Ref:009400 Bnf:Hwa Seung Netowrks America ID:7584-800-24847 Bnf Bk:Shinhan Bank ID:026011950 Pmt Det:010906180 07992Nn | 903706180232317 |
| 06/18 | 25.00 | Wire Transfer Fee | 903706180123094 |
| 06/22 | 100,000.00 | Wire Type:Wire Out Date:090622 Time:1246 Et Trn:2009062200169527 Service Ref:005695 Bnf:Hwa Seung Networks America ID:7584-800-24847 Bnf Bk:Shinhan Bank ID:026011950 Pmt Det:010906220 05450Nn | 903706220169527 |
| 06/22 | 25.00 | Wire Transfer Fee | 903706220125654 |
| 06/25 | 2,182.75 | Bank of America Business Card Bill Payment | 943206250005011 |
| 06/26 | 43,676.16 | Wire Type:Intl Out Date:090626 Time:1502 Et Trn:2009062600237326 Service Ref:063700 Bnf:Selim Textile Co Ltd. ID:375 007041 56 00 Bnf Bk:Industrial Bank Of Kore ID:006550494578 Pmt Det:01090626007708Nn | 903706260237326 |
| 06/26 | 17,835.00 | Wire Type:Intl Out Date:090626 Time:1635 Et Trn:2009062600274767 Service Ref:366737 Bnf:Hwaseung Networks Co. Ltd ID:650-005722-752 Bnf Bk:Korea Exchange Bank ID:006290094519 Pmt Det:01090626009224Nn | 903706260274767 |
| 06/26 | 45.00 | Wire Transfer Fee | 903706260153692 |
| 06/26 | 45.00 | Wire Transfer Fee | 903706260154194 |
| 06/29 | 35.00 | NSF: Returned Item Fee For Activity Of 06-26 Check #0000000610 | 955206260019694 |
| 06/29 | 100,000.00 | Online Banking transfer to Chk 5824 Confirmation# 5832357408 | 957306297538463 |
| 06/30 | 35.00 | NSF: Returned Item Fee For Activity Of 06-29 Check #0000000616 | 955206290051957 |
| 06/30 | 35.00 | NSF: Returned Item Fee For Activity Of 06-29 Check #0000000617 | 955206290051958 |
| 06/30 | 150,000.00 | Online Banking transfer to Chk 5824 Confirmation# 5940332653 | 957306307598289 |
| **Card Account # 4135 7445 0105 9953:** | | | |
| 06/02 | 202.50 | First Republic  06/02 #000009793 Withdrwl | 965206020009793 |
| 06/02 | 2.00 | First Republic  06/02 #000009793 Withdrwl | 965206020009793 |
| 06/03 | 202.50 | First Republic  06/02 #000009794 Withdrwl | 965206020009794 |
| 06/03 | 2.00 | First Republic  06/02 #000009794 Withdrwl | 965206020009794 |
| **Subtotal** | **409.00** | | |



## Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 06/01 | 25,186.96 | 06/11 | 239,773.07 | 06/24 | 75,064.00 |
| 06/02 | 324,982.46 | 06/12 | 82,748.07 | 06/25 | 136,424.56 |
| 06/03 | 66,825.96 | 06/15 | 56,449.37 | 06/26 | 31,280.84 - |
| 06/04 | 69,825.96 | 06/16 | 11,424.37 | 06/29 | 278,163.60 - |
| 06/05 | 7,477.14 | 06/18 | 25,849.52 | 06/30 | 34,474.53 - |
| 06/08 | 10,595.16 | 06/19 | 15,589.00 | | |
| 06/09 | 39,773.07 | 06/22 | 65,564.00 | | |

0001045

# How To Balance Your Bank of America Account

**FIRST, start with your Account Register/Checkbook:**

1. List your Account Register/Checkbook Balance here ........................................................................... $ _____

2. Subtract any service charges or other deductions not previously recorded that are listed on this statement ........... $ _____

3. Add any credits not previously recorded that are listed on this statement (for example interest) ...................... $ _____

4. This is your NEW ACCOUNT REGISTER BALANCE ............................................................................. $ _____

**NOW, with your Account Statement:**

1. List your Statement Ending Balance here .................................................................................. $ _____

2. Add any deposits not shown on this statement .............................................................................. $ _____

                                                                                                                    _____

### SUBTOTAL ......... $ _____

3. List and total all outstanding checks, ATM, Check Card and other electronic withdrawals

| Checks, ATM, Check Card, Electronic Withdrawals | | Checks, ATM, Check Card, Electronic Withdrawals | | Checks, ATM, Check Card, Electronic Withdrawals | |
|---|---|---|---|---|---|
| Date/Check # | Amount | Date/Check # | Amount | Date/Check # | Amount |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

4. TOTAL OF OUTSTANDING CHECKS, ATM, Check Card and other electronic withdrawals ............ $ _____

5. Subtract total outstanding checks, ATM, Check Card and other electronic withdrawals from Subtotal
   This Balance should match your new Account Register Balance ...................................... $ _____

Upon receipt of your statement, differences, if any, should be reported to the bank promptly in writing and in accordance with provisions in your deposit agreement.

## IMPORTANT INFORMATION FOR BANK DEPOSIT ACCOUNTS

**Change of Address.** Please call us at the telephone number listed on the front of this statement to tell us about a change of address.

**Deposit Agreement.** When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule, which contain the current version of the terms and conditions of your account relationship, may be obtained at our banking centers.

**Electronic Transfers: In case of errors or questions about your electronic transfers**
If you think your statement or receipt is wrong or if you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

* Tell us your name and account number.
* Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
* Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

**Reporting Other Problems.** You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or unauthorized transactions within the time periods specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree not to make a claim against us for the problems or unauthorized transactions.

**Direct Deposits.** If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled.

Bank of America, N.A. Member FDIC and  Equal Housing Lender

## Check Image

**Account Number: 4830 0125 8517**




Ref. No.: 813007392376401    Amount: 15,000.00




Ref. No.: 813004670773017    Amount: 300,000.00




Ref. No.: 813009092420434    Amount: 969.16




Ref. No.: 813004370784962    Amount: 2,952.00






Ref. No.: 813008592319225    Amount: 781.98

**Check Image Continues on Next Page**

0001048

## Check Image - Continued

**Account Number: 4830 0125 8517**




Ref. No.: 813004870886668   Amount: 500.00




Ref. No.: 813008192673699   Amount: 62,348.82




Ref. No.: 813008792762115   Amount: 40.01




Ref. No.: 813002282476591   Amount: 2,600.00




Ref. No.: 813009092420433   Amount: 967.58

**Check Image Continues on Next Page**

## Check Image - Continued

**Account Number: 4830 0125 8517**

 

Ref. No.: 813009292284904    Amount: 160,260.52



Ref. No.: 813008492575420    Amount: 112,304.11

 

Ref. No.: 813009092174381    Amount: 3,613.11

 

Ref. No.: 813004870034747    Amount: 500.00

 

Ref. No.: 813008492549102    Amount: 239.50



**Check Image Continues on Next Page**

Check Image - Continued

0001050

**Account Number: 4830 0125 8517**




Ref. No.: 813008492575419   Amount: 1,713.08




Ref. No.: 813009392480769   Amount: 3,258.95




Ref. No.: 813004670042205   Amount: 100,000.00




Ref. No.: 813004870191051   Amount: 2,952.00




Ref. No.: 813009192709851   Amount: 781.98

**Check Image Continues on Next Page**

Check Image - Continued

**Account Number: 4830 0125 8517**



Ref. No.: 813008992741610   Amount: 124.80





Ref. No.: 813008092276421   Amount: 50,000.00





Ref. No.: 813008592009166   Amount: 200.00







Ref. No.: 813008492885416   Amount: 2,000.00





Ref. No.: 813009392028742   Amount: 200.00



**Check Image Continues on Next Page**

0001052

Check Image - Continued

**Account Number: 4830 0125 8517**




Ref. No.: 813009392062473   Amount: 2,000.00

END OF CHECK IMAGE

**EXHIBIT 6**

Joint Sales Agreement


This Joint Sales Agreement is entered into as of this 22 day of August 2010 by and between

> Selim Textile, Inc., a company established and organized under the laws of the
> State of New York, Selim America, Inc., a company organized and existing under
> the laws of the State of New York, and June Yong Kim, an individual resident of
> the State of California; and

> Hwaseung Networks America, Corp., a company organized and existing under
> the laws of the State of New York (hereinafter referred to as "HS").

### WITNESSETH:

WHEREAS, Selim Textile, Inc. and June Yong Kim entered into a number of
agreements with HS providing for the sale of large quantities of yarn on a credit basis
and providing for various security arrangements to secure payment for the yarn;

WHEREAS, Selim Textile, Inc. and June Yong Kim committed material breaches of
those agreements and security mechanisms and the parties wish to provide for a
mechanism pursuant to which all sums payable to HS can be paid in full.

NOW, THEREFORE, the parties hereto agree as follows:

Article 1.  Outstanding Payables
          *APPROXIMATE*
The total amount payable to HS as of the date hereof is \$53,361,822.44 and Selim
agrees to repay in full the amount pursuant to the terms of this Agreement and liability
therefore shall be joint and several (said amount is hereinafter referred to as "Selim
Payables"). *THE PARTIES SHALL CONFIRM THE AMOUNT OF SELIM PAYABLES
WITHIN TWO WEEKS OF THE DATE HEREOF.*
Article 2.  Transfer of Title to Inventory

Selim agrees that upon execution hereof all rights and title to all inventory of unsold yarn
shall be transferred free and clear of any liens or encumbrances to  HS irrespective of
the location of such yarn to include any warehouses, storage facilities, customer
premises or any location whatsoever.  Notice of such transfer of title shall be delivered
to each warehouse and customer where such yarn is stored.  The invoice value of such
yarn as sold by HS to Selim shall be credited against the Selim Payables.

Article 3.  Transfer of Title of Accounts Receivable

Selim agrees that upon execution hereof all rights and title to any accounts payable to
Selim shall be transferred free and clear of any liens, attachments or encumbrances to
HS.  Notice of such transfer of title shall be given by Selim and HS to each customer
and their consent obtained.  Selim represents and warrants that attached list of

customers set forth in Exhibit A attached hereto is a complete list of all customers of Selim and the accounts receivable and the amounts due from each customer (said accounts receivables are hereinafter referred to as "AR"). Upon receipt of good value by HS of any of the AR, the amount so received shall be credited against the Selim Payable.

Article 4.  Cash on Hand

Selim agrees that 90% of all cash held in any bank account owned or controlled by Selim as of the date hereof shall be transferred to HS and credited against the Selim Payable. Selim agrees to provide to HS within three days of the date hereof complete copies of all bank statements of any bank account owned or controlled by Selim commencing with January 2010.

Article 5.  Future Sales

The parties agree that all future sales of yarn to the customers identified in the list of customers attached hereto as Exhibit B or any purchasers orders obtained by Selim for product shall be managed and controlled on a joint basis. The price offered to such customers on all future sales shall be agreed upon by HS and Selim agrees that no such sales shall be made at prices not agreed upon by HS. All sales agreements shall be between HS and such customer and all future accounts receivable shall be paid directly to HS. The parties agree, however, that the margin on such sales which shall be the difference between the price paid by the customer and the HS invoice value of such yarn, plus any customs, freight, transportation and warehousing expense shall be shared between HS and Selim on a 50:50 basis. The amount of such margin payable to Selim hereunder shall be calculated on a quarterly basis and paid to Selim within 15 days of the end of the quarter, provided, however, that so long as there remains any outstanding amount of the Selim Payable, of the margin payable to Selim, sixty percent (60%) shall be credited against the Selim Payable and forty percent (40%) shall be paid to Selim.

Article 6.  Sale of Current Inventory

The parties agree that with respect to the sale of any of the inventory transferred to HS hereunder pursuant to Article 2 hereof, any sums actually paid by Selim in respect of such inventory for customs, transportation, storage, warehousing or other similar charges shall be credited against the Selim Payable upon receipt of the sales price from customers.

Article 7.  Other Secured Property

Selim agrees that any and all assets owned by or controlled by Selim shall be offered to HS to secure the Selim Payable hereunder and the parties shall jointly agree on the disposition, sale or continued maintenance of such assets by Selim.

Article 8.  Remedies

The execution of this agreement by either of the parties hereto shall not be deemed a waiver of any rights or remedies that either party make exercise pursuant to the previous agreements between the parties, provided, however, that in the event Selim performs all of its obligations hereunder and there are no material breaches of such

obligations, HS agrees that it will not exercise any rights or remedies available to HS pursuant to such agreements to include the filing of any civil or criminal complaints against Selim. Further, any attachments or exercise of any remedies implemented by HS pursuant to such agreements which were taken or executed prior to the date hereof shall be released by HS.

Article 9.  Governing Law

This Joint Sales Agreement shall be governed by the laws of the State of New York.


In WITNESS HEREOF, the parties have caused their legally authorized representatives to execute this agreement as of the day and year first written above.

Hwaseung Networks America, Corp.


_____

Name:
Title:


Selim Textile, Inc.



_____

Name:
Title:

Selim America, Inc.



_____

Name:
Title:



_____

June Yong Kim

**EXHIBIT 7**

**CONFIDENTIAL SETTLEMENT DISCUSSIONS – FRE 408**

## DECLARATION OF JUNE YONG KIM

I, June Yong Kim, hereby declare as follows:

1.     I am the President and Sole Shareholder of Selim America, Inc.

("America") and Selim Textile, Inc. ("Textile").

2.     I have personal knowledge of the facts set forth herein.

3.     As of August 23, 2010, America had the assets identified in Exhibit 1

annexed hereto.

4.     Exhibit 2 annexed hereto shows the liabilities of America as of August 23,

2010.

5.     As of August 23, 2010, Textile had the assets identified in Exhibit 3

annexed hereto.

6.     Exhibit 4 annexed hereto shows the liabilities of Textile as of August 23,

2010.

I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge.

Executed this 2nd day of September 2010 at Los Angeles, California.

JUNE YONG KIM

## EXHIBIT 1

### Assets of America as of August 23, 2010

1.  Inventory and goods (yarn and fabrics)
    Possession of Frontier and Uni Global
    Estimated Market Value - $12 Million

2.  Accounts receivable
    Estimated Market Value - $8.8 Million

3.  Claim against Susan Kang for loans
    Amount: $40,000

4.  Claim against June Yong Kim for loans
    Amount: Approx. $1 Million to $1.5Million

5.  Claims against Hwaseung and affiliates and employees of Hwaseung for damages
    (including, without limitation, Lee Wan Man, and Young Dong Cho for receipt of
    "kickbacks")

6.  Security deposit to landlord of apartment occupied by June Yong Kim
    Approx. $4,200

7.  Deposit or prepayment to Executive Jet Management
    Amount: $90,000

8.  Desks (5), Chairs (10) and miscellaneous office supplies

9.  Cash of $2,000 in Chase Bank Account (subject to levy)

10. Interests in vehicles (3)
    - 2009 Maserati GT-S (paid the down payment of $80,000; purchase price
      was approx. $130,000) – under name June Yong Kim
    - 2007 Acura TL (paid the purchase price of $40,000) – under name June
      Yong Kim
    - 2009 BMW 650I (paid the down payment of $20,000); purchase price was
      approximately $90,000) – under name Jennifer Kim (of KIMKO)

11. Interest in NY Condo (123 Washington St. – W)
    Paid deposit for purchase $225,000 (not yet closed; no contingency) – under name
    June Yong Kim

## EXHIBIT B

### Liabilities of America as of August 23, 2010

| Name of Creditor | Secured | Priority | Unsecured |
|---|---|---|---|
| Prime Business Credit | Approx. $380,000 (includes contingent liability on letter of credit | | |
| Internal Revenue Service | | Approx. $140,000 | |
| New York State Dept. of Tax / Finance | | Approx. $74,000 | |
| Keystone Textile | | | Approx. $290,000 |
| Susan Kang | | | Approx. $5,000 |
| EYP Realty | | | Approx. $4,700 plus rejection damages in the event of rejection of lease |
| Sang Hee Yoon | | | Approx. $4,000 |
| Selim Textile | | | Approx. $53 M |

## EXHIBIT C

### Assets of Textile as of August 23, 2010

1.  Account receivable owed by America
    Approx. $54 million

2.  (2) Desks and chairs

3.  $2.2 million letter of credit for Industrial Bank of Korea

4.  Claim against June Yong Kim for loans
    Amount:  Approx. $500,000

# EXHIBIT D

## Liabilities of Textile as of August 23, 2010

| Name of Creditor | Secured | Priority | Unsecured |
|---|---|---|---|
| Industrial Bank of Korea | Approx. $2.5M | | |
| Hwaseung Networks America | Approx. $54M (secured disputed) | | |
| Frontier Logistics | Approx. $2.4M (secured disputed) | | |
| Uni Global Logistics | Approx. $21,500 | | |
| Unico Logistics | Approx. $268,000 | | |
| Internal Revenue Service | | Approx. $164,000 | |
| New York State Dept. of Tax / Finance | | Approx. $100,000 | |
| Ilshin Spinning Co. | | | Approx. $1,044,471.16 |
| Aceco Korea Corp. | | | Approx. $131,607.16 |
| Joong Jay Shin | | | Approx. $1,500 |
| Jacob's First LLC | | | Unknown plus lease rejection damages |

| In re  SELIM AMERICA, INC., | | CHAPTER  11 |
|---|---|---|
| In re  SELIM TEXTILE, INC., | Debtor(s). | CASE NO 2:10-bk-45503-RN<br>CASE NO 2:10-bk-45505-RN |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA  90067

A true and correct copy of the foregoing document described **DECLARATION OF JUNE YONG KIM IN SUPPORT OF DEBTORS' SUPPLEMENTAL OBJECTION TO EMERGENCY MOTION FILED BY HWASEUNG NETWORKS AMERICA, CORP. FOR APPOINTMENT OF CHAPTER 11 TRUSTEE AND SEQUESTRATION OF CASH COLLATERAL** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 7, 2010** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

    * Russell Clementson    russell.clementson@usdoj.gov
    * Monica Y Kim    myk@lnbrb.com
    * Monica Y Kim    myk@lnbyb.com
    * Elan S Levey    elevey@laklawyers.com, lgreenstein@laklawyers.com;rfeldon@laklawyers.com
    * Sam S Oh    sam.oh@limruger.com, julie.yu@limruger.com;amy.lee@limruger.com
    * Lindsey L Smith    lls@lnbrb.com
    * United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
    * Helen H Yang    hyang@ssd.com    ☐ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On  **September 7, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**VIA OVERNIGHT MAIL**
see attached service list    ☒ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 7, 2010** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.
**VIA ATTORNEY MESSENGER**
Hon. Richard Neiter
U.S. BANKRUPTCY COURT
255 E. Temple Street, Ctrm 1645
Los Angeles, CA  90012    ☐ Service information continued on attached page
I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

| September 7, 2010 | Angela Antonio | /s/ Angela Antonio |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

1

In re Selim America, Inc.
In re Selim Textile, Inc.
Case No. 2:10-bk-45503-RN
Case No. 2:10-bk-45505-RN
MML

**SERVED VIA OVERNIGHT MAIL OR NEF**
(*)

SELIM TEXTILE, INC.
Attn: June Yong Kim
725 S. Figueroa Street, Suite 3070
Los Angeles, CA 90017

SELIM AMERICA, INC.
Attn: June Yong Kim
725 S. Figueroa Street, Suite 3070
Los Angeles, CA 90017

Monica Y. Kim *
Levene, Neale, Bender, Yoo & Brill LLP
10250 Constellation Blvd.
Suite 1700
Los Angeles, CA 90067

U.S. Trustee *
Ernst & Young Plaza
725 S. Figueroa Street, 26th Floor
Los Angeles, CA 90017

EYP Realty LLC
725 S. Figueroa Street, Suite 1850
Los Angeles, CA 90017

Internal Revenue Service
P.O. Box 21126
Philadelphia, PA 19114

Keystone Textile
2541 S. Alameda Street
Los Angeles, CA 90058

New York State Dept of Tax/Finance
ATT: Office of Counsel
Building 9, W.A. Harriman Campus
Albany, NY 12227

Sang Hee Yoon
1437 Wildwood Drive
Los Angeles, CA 90041

Selim Textile, Inc.
725 S. Figueroa Street, Suite 3070
Los Angeles, CA 90017

Susan Kang
17320 Larisa Drive
Cerritos, CA 90703

Aceco Korea Corp
RM 906 Jungwood B/D
13-25 Yoido-Dong Youngdeungpo-Ku
Seoul KOREA,

Frontier Logistics Services
1700 N. Alameda St.
Compton, CA 90222

H.S. USA INC.
JULIE YANG, Agent, c/o Fenwick West
801 CALIFORNIA STREET
Mountain View, CA 94041

Hwaseung Networks America Corp.
485 Seventh Avenue, Suite 309
New York, NY 10018

ILSHIN SPINNING CO, LTD.
15-15 Yoido-Dong
Yongdeungpo-Ku
Seoul  KOREA,

Joong Jay Shin
358 5th Avenue, Suite 301
New York, NY 10001

UNI GLOBAL LOGISTICS
1971 W. 190th Street, Ste. 150
Torrance, CA 90504

Unico Logistics Co.,Ltd.
9TH FL, KUKJE BLDG, 111
DA-DONG, CHUNG-GU
Seoul KOREA,