1  Mark S. Horoupian (CA Bar No. 175373)
        mhoroupian@sulmeyerlaw.com
2  Avi E. Muhtar (CA Bar No. 260728)
        amuhtar@sulmeyerlaw.com
3  **Sulmeyer**Kupetz
   A Professional Corporation
4  333 South Hope Street, Thirty-Fifth Floor
   Los Angeles, California 90071-1406
5  Telephone: 213.626.2311
   Facsimile: 213.629.4520
6
   Attorneys for Howard M. Ehrenberg,
7  Chapter 11 Trustee

8

9                  **UNITED STATES BANKRUPTCY COURT**

10        **CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

11

12  In re                                    Case No. 2:10-bk-45503 RN

13                                            Chapter 11
    SELIM AMERICA, INC, a New York
14  corporation,
                                             **MOTION BY CHAPTER 11 TRUSTEE**
15                                            **FOR ORDER APPROVING SALE OF**
             Debtor.                          **INVENTORY AND ACCOUNTS**
16                                            **RECEIVABLE AND PROPOSED**
                                             **BIDDING PROCEDURES;**
17                                            **MEMORANDUM OF POINTS AND**
                                             **AUTHORITIES AND DECLARATION OF**
18                                            **HOWARD M. EHRENBERG IN**
                                             **SUPPORT THEREOF**
19

20                                            **DATE:**   December 1, 2010
                                             **TIME:**   9:00 a.m.
21                                            **PLACE:**  U.S. Bankruptcy Court
                                                          Courtroom 1654
22                                                        255 E. Temple Street
                                                          Los Angeles, CA 90012
23

24

25

26

27

28

690703.1

*Left margin vertical text:* **Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................... 4

II. FACTS ........................................................................................................... 5

    A.    Background.............................................................................................. 5

    B.    Hwaseung's Relationship With The Debtors and Claims Against The
        Estates................................................................................................. 6

III. The Asset Purchase Agreement ................................................................. 7

    A.    Description Of Assets Proposed To Be Sold ............................................. 7

        1.    Inventory ...................................................................................... 7

        2.    Accounts ..................................................................................... 8

            a.    Collectability Of The Trade Accounts ..................................... 8

            b.    Collectability Of The Kim Accounts ........................................ 8

    B.    Terms Of Sale........................................................................................ 9

        1.    Purchase Price............................................................................. 9

        2.    Exceptions To Free And Clear Sale And Assumptions of
            Liability ........................................................................................ 9

            a.    Liens Held By Industrial Bank Of Korea ................................. 9

            b.    Liens Held By Warehouse Claimants And Payment Of
                Customs ......................................................................... 10

        3.    Liens Held By PBC........................................................................ 11

            a.    Payment Under Protest ......................................................... 11

        4.    NO REPRESENTATIONS OR WARRANTIES ............................... 12

    C.    Bidding Procedures ............................................................................... 12

        1.    Overbids For Inventory.................................................................. 13

        2.    Overbids For The Uncollected Accounts........................................ 13

        3.    Deposit Required ......................................................................... 13

        4.    Backup Bidder.............................................................................. 13

5.    Inspection Of Inventory .................................................................... 13

6.    Update Of Face Amount of Receivables/Information
      Regarding Receivables .................................................................... 14

IV. DISCUSSION................................................................................................. 15

A.    The Trustee Has The Authority To Sell The Assets.................................... 15

B.    Application Of Legal Authority To The Proposed Sale.............................. 16

      1.    Sound Business Justification In Favor Of Approval Of The
            Sale/The Sale Is In The Estate's Best Interest................................. 16

            a.    Need To Sell Assets Expeditiously....................................... 16

            b.    Logistic Difficulties Alleviated By Sale .................................. 16

            c.    The Sale Results In Satisfaction In Full Of Secured
                  Claims ............................................................................. 16

            d.    There Are No Other Viable Options for the
                  Consolidated Estates ........................................................ 17

      2.    The Sale Was Adequately Marketed Under The
            Circumstances .................................................................................. 17

      3.    The Purchase Price Is Fair................................................................ 18

      4.    The Sale Is The Product Of Good Faith ........................................... 19

C.    The Trustee May Sell The Assets Free And Clear of Liens, Claims,
      Encumbrances And Interests Under 11 U.S.C. § 363(f) ............................ 19

D.    The Proposed Bidding Procedures Are Fair And Reasonable Under
      The Circumstances Of This Case ............................................................. 20

V. CONCLUSION ............................................................................................... 21

DECLARATION OF HOWARD M. EHRENBERG......................................................... 24

# **TABLE OF AUTHORITIES**

**Page**

**CASES**

In re Alves,
  52 B.R. 353 (Bankr. D. R.I. 1985) ........................................................................ 15

In re Investors Funding Corporation of New York,
  592 F.2d 134 (2nd Cir. 1979) <u>cert. denied</u> 444 U.S. 830 (1979) ........................... 15

Matter of Phoenix Steel Corp.,
  82 B.R. 334 (Bankr. D. Del. 1987) ...................................................................... 15

Texaco, Inc. v. Penzoil Co.,
  626 F. Supp. 250 (D. S.D.N.Y. 1986) ................................................................. 18

Doehring v. Crown Corp.  (In re Crown Corp.),
  679 F.2d 774 (9th Cir. 1982) .............................................................................. 20

In re 995 Fifth Ave. Assocs., L.P.,
  96 B.R. 24 (Bankr. S.D.N.Y. 1989) ..................................................................... 21

In re Crowthers  McCall Pattern, Inc.,
  114 B.R. 877 (Bankr. S.D.N.Y. 1990) ................................................................. 20

In re Elliot,
  94 B.R. 343 (Bankr. E.D. Pa. 1988) ................................................................... 19

In re Ewell,
  958 F.2d 276 (9th Cir. 1992) .............................................................................. 19

In re Financial News Network, Inc.,
  126 B.R. 152 (S.D.N.Y. 1991), *appeal dismissed*, 931 F.2d 217 (2nd Cir.
  1991) ................................................................................................................. 20

In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.,
  77 B.R. 15 (Bankr. E.D. Pa. 1987) ..................................................................... 19

In re Investors Funding Corp. of NY,
  592 F.2d 134 (2nd Cir. 1979) *cert. denied*, 444 U.S. 830 (1979) ....................... 15

In re Phoenix Steel Corp.,
  82 B.R. 334 (Bankr. D. Del. 1987) ...................................................................... 15

In re Table Talk, Inc.,
    53 B.R. 937 (Bankr. D. Mass. 1985)...................................................................... 20

In re Wilde Horse Enterprises, Inc.,
    136 B.R. 830 (Bankr. C.D. Cal. 1991) ........................................................... 15, 16

Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re
    Integrated Resources, Inc.),
    147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993)......... 21

Texaco, Inc. v. Penzoil Co.,
    626 F. Supp. 250 (D. S.D.N.Y. 1986) ................................................................. 18

**STATUTES**

11 U.S.C. § 363(b) ........................................................................................... 19

11 U.S.C. § 363(b)(1) ....................................................................................... 15

11 U.S.C. § 363(f) ............................................................................................ 19

11 U.S.C. § 363(f)(2)........................................................................................ 20

1    Howard M. Ehrenberg (the "Trustee"), they duly appointed and acting chapter

2    11 trustee in the above-captioned case of Selim America, Inc. ("Selim America"), hereby

3    moves this Court (the "Motion") for an Order approving the sale of the inventory and

4    accounts receivable of Selim America pursuant to the asset purchase agreement (the "APA")

5    entered into by and between the Trustee, on the one hand, and Hwa Seung Networks

6    America Corp., a/k/a Hwaseung Networks America Corp., a New York corporation

7    ("Hwaseung" and, together with the Trustee, the "Parties").  The Trustee further requests

8    that the Court approved the proposed bidding procedures contained herein, by which the

9    bankruptcy estate will be assured that it receives the maximum price for these assets.

10    A true and correct copy of the APA is attached to the accompanying

11    Declaration of Howard M. Ehrenberg (the "Ehrenberg Declaration") as Exhibit 1 and is

12    contingent upon this Court's approval of the Trustee's previously filed motion [Dkt No. 68]

13    (the "Substantive Consolidation Motion"), which seeks to substantively consolidate the

14    Debtor's estate with the estate of Selim Textile, Inc. ("Textile", and together with Selim

15    America, the "Debtors").  The APA, if approved, would affect both the Debtors' estates (the

16    "Consolidated Estates"), and the proposed sale would transfer the Consolidated Estates'

17    right, title and interest in the accounts receivable and inventory to the ultimate buyer.  The

18    proposed sale is also contingent upon the approval of the Trustee's settlement with

19    Hwaseung regarding the treatment of its claim (the "9019 Motion"). Accordingly, the hearing

20    on this Motion has been set for the same date as the hearings on the Substantive

21    Consolidation Motion and the 9019 Motion.

22    Through the APA, the Trustee proposes to sell, and Hwaseung Proposes to

23    purchase, substantially all of the Consolidated Estates assets (the "Assets"), including:

24    (1) all inventory (the "Inventory"); (2) all uncollected accounts receivable due from the

25    Debtors' customers other than any due from June Yong Kim (the "Trade Accounts"); and,

26    (3) all uncollected accounts receivable due from June Yong Kim and all obligations owing by

27    June Yon Kim to the Consolidated Estates for any loans that he took from the Debtors

28    (collectively, the "Kim Accounts" and, together with the Trade Accounts, the "Accounts").

1  The purchase price for the Inventory shall be $4.0M plus the assumption of certain secured

2  claims, including those of Industrial Bank of Korea ("IBK") (net of the certificate of deposit in

3  the amount of $2.2M plus interest it is holding (the "IBK CD")), Prime Business Credit

4  ("PBC") (to the extent its claim is not satisfied at the time of closing by its collection of certain

5  accounts receivable) , and certain parties holding statutory possessory liens such as

6  warehousemen and maritime liens.  The total amount of the secured claims to be assumed

7  are estimated to be $3.45M.  With respect to the Accounts, the purchase price shall be 25%

8  of the face value of said accounts, plus the assumption of any outstanding balance owed to

9  PBC.[1]  Furthermore, with respect to the IBK CD, the Trustee requests that the order

10  approving the APA provide that IBK may retain and apply the IBK CD against its claim.

11        The APA was entered into as part of larger settlement agreement between the

12  Parties (the "Settlement Agreement") which seeks to resolve all claims, adversary

13  proceedings, and disputes by and among, the Trustee, Hwaseung, the Debtors, and the

14  Consolidated Estates.  This Motion only seeks an Order approving the APA.  The APA is

15  contingent upon the Court's entering of an Order approving the Settlement Agreement.

16  Concurrently with the filing of this Motion, the Trustee has filed a separate motion for an

17  Order approving the Settlement Agreement.  A copy of the Settlement Agreement is attached

18  to the accompanying Ehrenberg Declaration as Exhibit 2.

19        The Settlement Agreement generally provides that Hwaseung shall hold an

20  allowed claim in the amount of $53,361,822.00 (the "Allowed Claim"), secured by a perfected

21  and unavoidable security interest in the Assets and their proceeds.  In exchange for the

22  Allowed Claim and the deemed perfection in the Collateral, the Settlement Agreement,

23  generally provides that Hwaseung will pay to the Consolidated Estate $1.0M for the benefit

24  of the Consolidated Estates' unsecured creditors, and any shortfall in funds needed to pay in

25  full all allowed administrative priority claims.

26

27  _____

   [1]  According to information provided by Prime Business Credit to the Trustee, it appears that

28  PBC will have been paid in full through its collection of accounts receivable.

1    This Motion is brought pursuant to section 363 of title 11 of the United States

2    Code (the "Bankruptcy Code") and is based upon this Motion, the accompanying

3    Memorandum of Points and Authorities and Ehrenberg Declaration, the separately-filed

4    Notice of Motion and proposed bidding procedures, the record in this case and any other

5    further argument or evidence that may be presented to the Court before or at the hearing on

6    the Motion.  In the exercise of the Trustee's business judgment, the Trustee believes that the

7    proposed settlement is fair, reasonable and in the best interests of the Estate.

8    **WHEREFORE**, the Trustee respectfully requests that this Court enter an Order:

9    (1) granting this Motion; (2) approving the APA; (3) approving the bidding procedures

10   proposed herein; (4) authorizing the Trustee to sell the Assets pursuant to the terms and

11   conditions set forth in the APA and to take any and all actions necessary to further effectuate

12   the terms of the APA; and (5) providing such other and further relief as is proper.

13

14   DATED:  November 10, 2010              Respectfully submitted,

15                                                         **Sulmeyer**Kupetz
                                                            A Professional Corporation
16

17

18                                                         By:  */s/ Mark S. Horoupian*
                                                                  Mark S. Horoupian
19                                                                Attorneys for Howard M. Ehrenberg,
                                                                  Chapter 11 Trustee
20

21

22

23

24

25

26

27

28

690703.1                                         3

## MEMORANDUM OF POINTS AND AUTHORITIES[2]

The Trustee hereby submits the following memorandum of points and authorities in support of the Motion.

I.

## INTRODUCTION

The Motion seeks approval of an agreement that will sell substantially all of the Consolidated Estates' Assets to Hwaseung, or the highest bidder, pursuant to section 363 of the Bankruptcy Code. Hwaseung is the Debtors' largest creditor and, if the Settlement Agreement pending before this Court is approved, Hwaseung would maintain a perfected and unavoidable security interest in all the Assets. The APA proposes to allow Hwaseung to credit bit up to the amount of its Allowed Claim for the purchase of the Assets. The APA is contingent upon this Court's approval of the Trustee's Substantive Consolidation Motion and on the approval of the Settlement Agreement.

Generally, the APA proposes to sell the Inventory for $4.0M plus the assumption of certain liens senior to Hwaseung (with an estimated amount claimed by said lienholders of $3.45M) and the Accounts that remain uncollected and outstanding for 25% of their face value. Further, the APA, as detailed below, provides bidding and overbidding procedures for the proposed sale of the Assets.

The APA will provide for the liquidation of the Debtors' Assets in an efficient and expeditious manner that will guarantee a substantial recovery for the benefit of the Consolidated Estates. The Trustee believes the proposed purchase price for the Assets is fair and reasonable, especially in light of uncertainties with respect to the collectability of the Accounts, and the location and condition of certain of the Inventory, as discussed below. Moreover, the APA along with the Settlement Agreement ensure a consensual resolution of

---

[2] Terms not defined herein shall have the same meaning ascribed to them in the foregoing Motion.

1  all issues between the Parties that will avoid the substantial administrative expenses and

2  costs inherent with objecting to Hwaseung's claims and litigating issues pertaining to

3  Hwaseung's security interests.

4         The Trustee believes that the APA is in the best interests of the Consolidated

5  Estates. Accordingly, the Trustee urges the Court to grant the Motion and approve the APA.

6  <div align="center">II.</div>

7  <div align="center"><u>FACTS</u></div>

8  **A.**    **Background**

9       1.    The Debtors' business entailed importing a variety of textile goods (e.g.

10 yarns and fabrics) from foreign suppliers (generally on credit), and re-selling those goods

11 within the United States. The Debtors' sale of the goods to customers would generate

12 accounts receivables.

13      2.    On August 23, 2010 (the "<u>Petition Date</u>") the Debtors, each filed

14 voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

15 "<u>Bankruptcy Code</u>").

16      3.    On August, 27, 2010, Debtors' counsel filed their complaint against

17 creditor Hwaseung Networks America, Corp. ("<u>Hwaseung</u>") [Dkt No. 8], thereby commencing

18 an adversary proceeding [Adv. No. 2:10-ap-02585 RN] (the "<u>Hwaseung Adversary</u>

19 <u>Proceeding</u>"). The Hwaseung Adversary Proceeding, among other things, challenges the

20 extent, priority and validity of Hwaseung's liens against the Consolidated Estates.

21      4.    On September 17, 2010, this Court entered its Order [Dkt No. 55]

22 appointing Howard M. Ehrenberg as chapter 11 Trustee for the Debtor's estate.

23      5.    On October 8, 2010, the Trustee filed his motion [Dkt No. 68] (the

24 "<u>Substantive Consolidation Motion</u>") for an order substantively consolidating the estates of

25 Textile, Case No. 2:10-bk-45505 RN, and the Debtor. A hearing on the Substantive

26 Consolidation Motion is currently scheduled before this Court on December 1, 2010.

27 / / /

28 / / /

6.      On October 25, 2010, the Trustee filed his motion [Docket No. 73] seeking approval of a settlement (the "PBC Settlement") entered into between the Estate and Prime Business Credit, Inc. ("PBC"). The PBC Settlement agreement provides, among other things, that PBC shall be authorized to collect the Accounts Receivable on behalf of and for the benefit of the Estate, and to apply the collections of the Accounts Receivable to its compromised claim. The PBC Settlement further provides that PBC shall continue to be engaged as the collection agent by any subsequent purchaser of the Accounts Receivable. A hearing on the motion seeking approval of the PBC Settlement is currently scheduled before this Court for November 17, 2010.

**B.      Hwaseung's Relationship With The Debtors and Claims Against The Estates**

1.      Hwaseung was the Debtors' principle supplier of textile goods.  The Debtors would purchase product from Hwaseung on credit and subsequently ship those products to the United States. The product would be stored in third party warehouses pending sale to the Debtors' customers.  According to America, the relationship between America and Textile was as follows:  Textile would purchase the goods from Hwaseung; Textile would "sell" the goods to America, and would create an intercompany receivable from America to Textile; America would then sell the goods to its customers, which would create a receivable from the customer to America.  From the Debtors' records, it is unclear if America ever paid Textile for any of the goods America "purchased" from Textile.

2.      In Textile's "List of Creditors Holding 20 Largest Unsecured Claims" [Dkt No. 1, p. 7 in the Textile Case] filed by Textile at the commencement of its case, Textile verified under penalty of perjury that Hwaseung held a claim against Textile in the amount of $53,361,822.00.  Hwaseung has asserted that, in connection with its sale of product to the Debtors, the Consolidated Estates in fact owe Hwaseung in excess of $59M.    The Settlement Agreement propose to allow Hwasueng's claim in the amount of $53,361,822.00 (the "Allowed Claim Amount").

/ / /

1            3.      Hwaseung has further asserted that, pursuant to a security agreement

2    which was signed in January of 2010 and a UCC financing statement that was filed in the

3    state of New York in May 2009, it maintains a valid and perfected security interest in

4    substantially all of the Consolidated Estates' assets (the "Collateral"), including: (a) all

5    inventory (the "Inventory"); (b) all accounts receivable due from the Debtors' customers other

6    than any due from June Yong Kim (the "Trade Accounts") and any and all sums collected

7    thereon; and (c) all accounts receivable due from June Yong Kim, all obligations owing to the

8    Consolidated Estates for any loans taken from the Debtors (collectively, the "Kim Accounts"

9    and, together with the Trade Accounts, the "Accounts") and any and all sums collected

10   thereon.  The extent, priority, and validity of Hwaseung's liens against the Consolidated

11   Estates is the subject of the Hwaseung Adversary Proceeding.  The Settlement Agreement

12   proposes to deem Hwaseung maintaining validly perfected and unavoidable liens.

13                                         III.

14                    **The Asset Purchase Agreement**

15   **A.      Description Of Assets Proposed To Be Sold**

16            **1.      Inventory**

17            The Debtors' Inventory consists primarily of yarn and fabric.  (A detailed

18   description of the Inventory proposed to be sold is contained in Exh. "A" to the APA, which is

19   attached to the Ehrenberg Declaration hereto as Exhibit 1.)  The Inventory is presently being

20   stored in certain third party warehouses. The three logistic companies responsible for

21   currently storing the Inventory are Frontier Logistics, Inc. ("Frontier"), Uni Global Logistics,

22   Inc. ("Uni-Global"), and Unico Logistics Co, Ltd. ("Unico").  The Inventory at Frontier is

23   located at two warehouses located at 1700 N. Alameda Street, Compton, CA 90222, and

24   14439 S. Avalon Blvd., Gardena, CA 90248.  The Inventory at Uni-Global is located in three

25   separate warehouses located at UDT, 801 W. Artesia Blvd., Compton, CA 90220; Harbor

26   Choice, 500 E. Gardena Blvd., Gardena, CA 90248; and  BNX Shipping, Inc., 910 E. 236th

27   St., Carson, CA 90745. Five containers of the Unico Inventory are located at its warehouse

28

1  located at 10711 Walker St., Bldg D-Rear, Cypress, CA, and five additional containers are

2  being held in its warehouse in Pusan (aka Busan), Korea.

3                    **2.     Accounts**

4                    As noted above, the Debtors generated Accounts Receivable from the sale of

5  product, primarily yarn and fabric supplied by Hwaseung, to their customers. The accounts

6  proposed to be sold consist of: (a) all accounts receivable due from the Debtors' customers

7  other than any due from June Yong Kim (the "Trade Accounts"); and (b) all accounts

8  receivable due from June Yong Kim and all obligations owing by June Yon Kim to the

9  Consolidated Estates for any loans that he took from the Debtors (collectively, the "Kim

10  Accounts" and, together with the Trade Accounts, the "Accounts"). Only those Accounts that

11  remain outstanding and uncollected (the "Uncollected Accounts") as of three business days

12  prior to the auction date (the "Cut-off Date") will be sold. (All Trade Accounts are identified in

13  Exh. "B" to the APA, which is attached to the Ehrenberg Declaration hereto as Exhibit 1.)

14  Further, the APA deems the face amount of the Kim Accounts, as of the date of the filing of

15  this Motion, to be $2.98M.

16                    **a.     Collectability Of The Trade Accounts**

17                    Prior to the Petition Date, PBC, pursuant to a certain factoring agreement, was

18  engaged as the Debtors' collection agent. Pursuant to the PBC Settlement (the approval of

19  which is pending before this Court), the Trustee has sought to authorize PBC to continue its

20  collection activities. The APA further provides that the successful buyer of the Uncollected

21  Accounts shall assume all collection agreement entered into by the Trustee with PBC.

22                    Even with PBC's best efforts, the Trustee believes that the degree of

23  collectability of the Trade Accounts is uncertain. In contrast, the sale of the Uncollected

24  Accounts would guarantee a substantial recovery for the benefit of the Consolidated Estates.

25                    **b.     Collectability Of The Kim Accounts**

26                    The Trustee believes that any attempts to collect the Kim Loans from the

27  Debtors' principal, June Yon Kim ("Kim"), would be time consuming, costly, and, at best,

28

690703.1                                    8

1  result in a questionable recovery.  On the other hand, the sale of the Kim Accounts would

2  result in guaranteed recover for the benefit of the Consolidated Estates.

3       **B.**    **Terms Of Sale**

4           **1.**    **Purchase Price**

5          The APA proposes to sell, as is, where is, and with all faults, the Inventory for

6  $4.0M, plus the assumption of certain secured claims as discussed below.  In addition to

7  being responsible for payment of the secured claims, the buyer will be responsible for

8  payment of any customs, duties, or charges necessary for the release of the Inventory.

9  None of these charges will be paid by the Trustee or the Consolidated Estates.  The total

10  amount of the secured claims to be assumed is below.  As to the Uncollected Accounts, the

11  Purchase Price is 25% of their face value as of the Cut-Off Date for collections by the

12  Trustee (three business days prior to the sale hearing), plus an assumption of the remaining

13  balance owed to PBC, if any.  The APA proposes to sell the Assets free and clear of all liens

14  except as further detailed below.

15           **2.**    **Exceptions To Free And Clear Sale And Assumptions of Liability**

16              **a.**    **Liens Held By Industrial Bank Of Korea**

17          Industrial Bank of Korea ("IBK") is a creditor of the Consolidated Estates and

18  holds a total claim against Textile in the approximate amount $2,291,068.75, as of

19  November 2, 2010, plus *per diem* interest in the amount of $461.30 (the "IBK Claim").

20  Prepetition, the Debtors posted a letter of credit, in the form of a certificate of deposit, in the

21  amount of $2.2M in favor of IBK (the "IBK CD") to secure the debt owed to it.  IBK further

22  filed a UCC financing statement with the New York Secretary of State, thereby perfecting a

23  security interest in certain of the Debtors' assets (the "IBK Lien").  Interest on the IBK CD as

24  of the maturity date of November 18, 2010 is approximately $38,500.00.

25          As part of the Motion, and conditioned upon consolidation of the Bankruptcy

26  Cases, the Trustee requests that IBK be authorized to retain the IBK CD and set it off against

27  the IBK Claim.  The Trustee has reviewed the loan documentation provided by IBK, and is

28  satisfied that IBK has a valid and properly perfected security interest in the IBK CD. Further,

1  IBK has provided disbursement information to the Trustee which substantiates its claim that

2  the IBK Claim exceeds the IBK CD. However, the Trustee requests that IBK's application of

3  the IBK CD to its claim be without prejudice to the Trustee later seeking to recover, in whole

4  or in part, the value of the IBK CD from IBK in the event that it is later determined that the

5  IBK Claim did not exceed the value of the IBK CD.    The IBK Lien will be substantially

6  satisfied by allowing IBK to retain and apply the IBK CD. Immediate application of the IBK

7  CD to the IBK Claim is necessary to prevent further accrual of interest, and to facilitate the

8  proposed sale. Nevertheless, the sale of the Inventory shall be subject to any of IBK's valid,

9  perfected, and unavoidable liens against the Assets that secure an allowed claim against the

10  Consolidated Estates, but only to the extent of the remaining amounts owed to IBK by Textile

11  after application of the IBK CD against the IBK Claim. In other words, the successful bidder

12  for the Inventory shall be responsible for the payment of IBK's remaining claim, which is

13  estimated to be approximately $60,000.00 assuming a closing of the sale of December 15,

14  2010.

15              **b.    Liens Held By Warehouse Claimants And Payment Of**

16              **Customs**

17              The Inventory is presently being stored, and has been stored, in certain third

18  party warehouses. To the extent that any of these warehouses hold valid, perfected, and

19  unavoidable liens against the Assets securing allowed claims against the Consolidated

20  Estates or otherwise hold a possessory lien that must be paid or otherwise satisfied as a

21  condition to obtaining the release of the Inventory in the possession of such claimant

22  (collectively, the "Warehouse Claimants"), the sale of the Inventory shall be subject to such

23  liens. In other words, the successful purchaser of the Inventory shall be obligated to assume

24  all liabilities and to pay the Warehouse Claimants to the extent that they hold allowed

25  secured claims (*i.e.*, warehouseman's, maritime or other possessory liens) against the

26  Consolidated Estates secured by the Inventory. In addition, any successful purchaser of the

27  Inventory, and not the Consolidated Estates or the Trustee, shall be responsible to pay any

28  customs or duties required to obtain the release of the Inventory.

1    The known Warehouse Claimants,[3] and the amounts that they are claiming is

2  owed to each of them, are as follows:

3    a.    Frontier:  The Trustee understands that Frontier is asserting

4  secured claims of $2,417,170.22 as of October 31, 2010 with charges accruing at

5  approximately $17,000.00 per month.  Accordingly, estimated charges, assuming a closing

6  date of December 31, 2010, will be $2,451,653.18.

7    b.    Unico:  The Trustee understands that Unico is asserting secured

8  claims of $308,194.35 (as of September 7, 2010) together with accrued charges for storage,

9  customs, duties, demurage, etc. thereon.  Estimated charges, assuming a closing date of

10  December 31, 2010, will be $350,000.00.  (Though requested, Unico did not provide updated

11  figures prior to the filing of this Motion).

12    c.    Uni-Global:  As of the end of November, 2010, the Trustee

13  understands that Uni-Global is asserting a secured claim of $519,781.28, and that charges

14  are continuing to accrue at the approximate rate of $68,000.00 per month.  Estimated

15  charges, assuming a closing date of December 31, 2010, will be $588,181.28.

16        **3.    Liens Held By PBC**

17    The sale of the Uncollected Accounts shall be subject to any outstanding, valid,

18  perfected, and unavoidable lien against the Assets in favor of PBC and that secures an

19  allowed claim against the Consolidated Estates. Moreover, any successful purchaser of the

20  Uncollected Accounts shall be obligated to assume and pay any allowed secured claim

21  against the Consolidated Estates held by PBC. As of the date of this Motion, and based on

22  information from PBC, it is assumed that there will be no outstanding claim in favor of PBC.

23        **a.    Payment Under Protest**

24    The purchaser of the Assets may pay the secured claims described above

25  under protest and will retain the right to object to said claims subject to the tfiling of proofs of

26  _____

27  [3]  Total Known Estimated Secured Warehousemen/Possessory Lien Claims: $3,389,834.30
(warehouse charges may be subject to pro ration if closing occurs prior to the end of

28  December).

1  claims or requests for payment of administrative expenses by such claimants and allowance

2  thereof by the Bankruptcy Court.  The notices of bar dates served by the Trustee upon such

3  claimants shall provide that any provisional payments received by them on account of their

4  asserted liens shall be subject to disgorgement to the extent their claims or requests are

5  disallowed by the Bankruptcy Court.  Trustee shall have no obligation of any kind to object to

6  the claims of the Warehouse Claimants, IBK and/or Prime; provided, however, to the extent

7  the Trustee has avoidance  claims under the Bankruptcy Code to avoid or challenge any

8  such liens (which claims are expressly not included in this Agreement), Buyer shall have the

9  right, at Buyer's sole expense, to require the Trustee to take reasonable steps to avoid any

10  lien or interest against the Assets held a by the Warehouse Claimants, IBK and/or Prime.

11  The Trustee's obligations in this regard will terminate upon entry of an order closing the

12  case.  The Trustee's obligations, if any, under this section may be accomplished by the

13  Trustee's assignment of such avoidance claims to Buyer.

14  **4.    NO REPRESENTATIONS OR WARRANTIES**

15  **THE INVENTORY AND ACCOUNTS ARE BEING SOLD STRICTLY ON AN**

16  **AS-IS, WHERE-IS, BASIS, WITH NO REPRESENTATIONS OR WARRANTIES BEING**

17  **MADE BY THE TRUSTEE OF ANY KIND WHATSOEVER.  ANY BIDDER, INCLUDING**

18  **HWASEUNG, WILL BE DEEMED TO BE RELYING ON THEIR OWN INDEPENDENTLY**

19  **CONDUCTED DUE DILIGENCE AND INVESTIGATION, WITHOUT RECOURSE OF ANY**

20  **KIND AGAINST THE TRUSTEE OR THE ESTATE WITH RESPECT TO THE PURCHASED**

21  **ASSETS.**

22  **C.    Bidding Procedures**

23  The sale of the Assets to Hwaseung is subject to overbids by other qualified

24  buyers at an auction to be conducted in the Court.  The Uncollected Accounts and the

25  Inventory may be purchased separately.  All overbidders (the "Bidders") shall be required to

26  sign an asset purchase agreement that has substantially the same terms as contained in the

27  APA, though such APA will be modified in the event that a Bidder wishes to bid on only the

28

1  Inventory or only the Accounts. Hwaseung will be permitted to credit bid its allowed secured

2  claim up to the full amount of the claim. Overbids for the Inventory

3         **1.    Overbids For Inventory**

4        The minimum overbid for the Inventory shall be $4.25M, plus the assumption of

5  all liabilities detailed above (*i.e.*, the IBK Lien and liens of Warehouse Claimants). Any

6  additional overbids shall be in increments of $50,000.00.

7         **2.    Overbids For The Uncollected Accounts**

8        The minimum overbid for the Uncollected Accounts shall be 30% of their face

9  value, plus the assumption of all liabilities detailed above (*i.e.*, remaining claim, if any, of

10  PBC). Any additional overbids shall be in increments of 5% of the face value.

11         **3.    Deposit Required**

12        Any prospective overbidder (either with respect to the Accounts or the

13  Inventory) must provide the Trustee with a deposit of $500,000.00 on or before the auction

14  date. The deposit will be non-refundable if the overbidder is the highest bidder and fails to

15  close for any reason other than the Court's failure to approve the sale or the Trustee's

16  breach of obligations detailed in the APA.

17        Any deposit retained by the Trustee as a result of an overbidder's failure to

18  close shall be used by the Trustee to fund the Unsecured Carve-Out and/or the Admin

19  Claims Reserve, as said terms are defined in the Settlement Agreement.

20         **4.    Backup Bidder**

21        In the event that Hwaseung is outbid by any overbidder either with respect to

22  the Inventory or the Uncollected Accounts, as the case may be, and Hwaseung is the second

23  highest bidder, then, in the event the overbidder fails to close, Hwaseung shall be required to

24  close.

25         **5.    Inspection Of Inventory**

26        Any Bidder wishing to physically inspect the Inventory (except the five

27  containers currently in Pusan) may do so on November 23, 2010, from 8:00 AM to 5:00 p.m.,

28  at the following locations:

1         ➢    **FRONTIER INVENTORY**

2      1700 N. Alameda Street, Compton, CA  90222

3           < and >

4      14439 S. Avalon Blvd., Gardena, CA  90248

5         ➢    **UNIGLOBAL INVENTORY**

6      UDT, 801 W. Artesia Blvd., Compton, CA  90220

7      Harbor Choice, 500 E. Gardena Blvd., Gardena, CA  90248

8           < and >

9      BNX Shipping, 910 E. 236th St., Carson, CA  90745

10        ➢    <u>UNICO INVENTORY</u>

11     10711 Walker St., Bldg D (rear), Cypress, CA

12     If further information is required concerning inspection, contact John Baer at

13     jbaer@sulmeyerlaw.com, with a copy to the Trustee at hehrenberg@sulmeyerlaw.com.

14     Bidders are advised that the Inventory is in cartons, and physical inspection (random or

15     detailed of the contents of cartons) is not provided for. Inspection is limited to viewing the

16     inventory as it is in place at each location.  Further, the Trustee due to the extent of the

17     Inventory, and the manner in which it is being stored, has not conducted a physical

18     inventory,  carton count or physically inspected the contents of cartons (random or detailed).

19     As stated above, the Inventory is sold on an as-is, where-is basis, with no representations or

20     warranties of any kind.

21          **6.**     **<u>Update Of Face Amount of Receivables/Information Regarding</u>**

22     **<u>Receivables</u>**

23     As the ultimate amount of the bid for the Accounts will be a percentage of the

24     face amount of receivables remaining as of the Cut-Off Date (as described in the APA), the

25     Trustee will file an amended schedule of Accounts as of the Cut-Off Date within one court

26     day prior to the hearing on this Motion. Any party wishing to review the information regarding

27     the Accounts that the Trustee has in his possession, must contact Mr. Baer.  Information will

28

1 | be provided to such parties on the condition of the execution of a non-disclosure and
2 | confidentiality agreement.

3 | <center>IV.</center>

4 | <center>**DISCUSSION**</center>

5 | <center>A.    **The Trustee Has The Authority To Sell The Assets**</center>

6 |   The Trustee has the right and power to sell the Asset pursuant to 11 U.S.C.
7 | § 363(b)(1), which provides that:

8 | > [t]he trustee, after notice and a hearing, may use, sell, or lease,
> other than in the ordinary course of business, property of the
9 | > estate.

10 |   In approving a sale outside the ordinary course of business, the Trustee must
11 | not only articulate a sufficient business reason for the sale, but he must present evidence to
12 | the Court sufficient for it to find that the sale is in the best interest of the Estates.  In other
13 | words, the sale is fair and reasonable, it has been adequately marketed, it has been
14 | negotiated and proposed in good faith, and it is an "arms-length" transaction.  *See* In re
15 | Wilde Horse Enterprises, Inc., 136 B.R. 830 (Bankr. C.D. Cal. 1991) (in determining whether
16 | a proposed sale of equipment was proper under section 363, court considered whether the
17 | terms of proposed sale were fair and equitable, whether there was a good business reason
18 | for completing the sale and whether the transaction was proposed in good faith). *See also* In
19 | re Phoenix Steel Corp., 82 B.R. 334, 335-356 (Bankr. D. Del. 1987).  Additional factors a
20 | court should consider in deciding whether to approve a sale of property under section 363
21 | include the integrity of the sale and the preservation of the best interest of the estate. *See* In
22 | re Alves, 52 B.R. 353 (Bankr. D. R.I. 1985).  A sale of an estate's interest in real or personal
23 | property generally is allowed under section 363 if the estate has equity in the property and
24 | the sale is in the best interest of the estate.  In re Investors Funding Corp. of NY, 592 F.2d
25 | 134, 135 (2nd Cir. 1979) *cert. denied*, 444 U.S. 830 (1979).

26 |   As noted, a sale outside the ordinary course of business must be based upon a
27 | sufficient business reason and be in the best interests of the estate.  The assets must have
28 | been adequately marketed, the sale negotiated and proposed in good faith, and the sale

1   must be the result of an "arms-length" transaction. <u>Wilde Horse Enterprises</u>, 136 B.R. at

2   830.  For the reasons presented herein, the Trustee respectfully submits that the sale and

3   related transactions meet all of the requisite criteria, thereby dictating in favor of the Court's

4   approval.

5       **B.    Application Of Legal Authority To The Proposed Sale**

6           **1.    Sound Business Justification In Favor Of Approval Of The**

7               **Sale/The Sale Is In The Estate's Best Interest**

8               In this case, several factors support a finding that the sale is in the best interest

9   of the Estate and that it is based upon a sound business justification.

10                  **a.    Need To Sell Assets Expeditiously**

11              The Trustee believes that it is imperative that the Inventory and Accounts be

12  liquidated immediately.  With respect to the Inventory, while it is not perishable, the

13  continued accrual of storage charges will quickly result in a diminution in the net value of the

14  assets. As stated above, the monthly storage fees approaches $100,000.00 per month.  As

15  such, it is critical that the Inventory be sold quickly and efficiently. Furthermore, while PBC is

16  actively engaged in collection of the Trade Accounts, the Trustee believes that the more time

17  that passes, the more difficult the Trade Accounts and the Kim Accounts will be to collect

18  and realize value for the benefit of the Estate.

19                  **b.    Logistic Difficulties Alleviated By Sale**

20              The proposed sale eliminates the logistic difficulties associated with the storage

21  of the Inventory, and the costs that would be associated with moving the Inventory.  The

22  Inventory consists of many thousands of cartons, with millions of pounds of yarn and other

23  textiles. If the Trustee were compelled to move this Inventory, the cost to the Estate could

24  be staggering. Instead, through the proposed sale, the Buyer will be responsible for all costs

25  associated with taking physical possession of the goods.

26                  **c.    The Sale Results In Satisfaction In Full Of Secured Claims**

27              The sale benefits the Consolidated Estates in that it will result in the

28  satisfaction of all secured claims. By the terms of the APA, the liens held by PBC, IBK and

the Warehouse Claimants will be assumed and assigned to the buyer of the Inventory and the Accounts.  These claimants will then be assured of payment in full by the Buyer, as with respect to the warehouse claimants, they will theoretically not release the goods they are holding without first having payment arranged by the Buyer.  With respect to PBC, it will be paid through its collection agreement.  Finally, with respect to IBK's remaining claim, if it is not paid, it will attach to the Inventory.  Further, the sale, as proposed, will result in a reduction in Hwaseung's claim of at least $6.0M ($4.0M on account of credit bid for Inventory, and approximately $2.5M credit bid for Accounts).

<div align="center">

**d.**        **There Are No Other Viable Options for the Consolidated Estates**

</div>

The Trustee received several expressions of interest to purchase the Inventory from parties in the textile industry.  Based on these proposals, it became clear to the Trustee that Hwaseung's proposal was the only viable option for the Estates.  The expressions of interest revealed to the Trustee that it is unlikely, though not impossible, that any party will pay more than the value that is being provided by Hwaseung under the APA.  Indeed, several of the cash offers received by the Trustee would not even be sufficient to discharge the secured claims of the Warehouse Claimants.  Nonetheless, through the proposed Bidding Procedures, the Trustee and the Consolidated Estates will be assured that the highest price will be obtained for the Assets in the event that someone is willing and able to pay more than the consideration offered by Hwaseung.  Furthermore, the Trustee considered that holding out for a higher price from a third party would only have a very marginal incremental effect on the Consolidated Estates because of the enormity of Hwaseung's claim, whether secured or unsecured.

<div align="center">

**2.**        **The Sale Was Adequately Marketed Under The Circumstances**

</div>

Given the facts of the case, the Trustee believes that the marketing of the sale was adequate.  The Trustee has maintained contact with the various parties that have expressed an interest in purchasing the Inventory. He has served the notice of the proposed bidding procedures and sale upon those parties, and will work with them to allow them to

1   inspect the Inventory, as discussed above.  The Trustee has also published notice of the

2   sale as required by the Local Bankruptcy Rules, and will also post the opportunity on the

3   National Association of Bankruptcy Trustee's asset sale section, as well as the bankruptcy

4   sale section of the website maintained by Danning, Gill, Diamond & Kollitz, LLP.  Given the

5   fact that any increase in the purchase price will inure to the benefit of Hwaseung almost

6   exclusively, the Trustee inquired if Hwaseung wished to incur further marketing expenses,

7   such as the cost of advertisement in trade journals, or national publications.  Hwaseung

8   expressly declined to incur such expense.

9                    **3.       The Purchase Price Is Fair**

10          It is axiomatic that the best test of value is what an informed buyer would pay

11  for the property.  <u>Texaco, Inc. v. Penzoil Co.</u>, 626 F. Supp. 250 (D. S.D.N.Y. 1986).  As such,

12  through the proposed bidding process, the Consolidated Estates will be assured that they will

13  receive the best and highest bid for the Assets.  Independent of the bidding process,

14  however, the Trustee believes that the proposed purchase prices are fair and reasonable.

15  With respect to the Inventory, the effective purchase price exceeds $7.4M, when factoring in

16  the $4.0M credit bid, and the assumption of more than $3.4M of secured claims.  Based on

17  the expressions of interest received by the Trustee, he believes that this a reasonable price

18  in relation to the value of the goods.  With respect to the Accounts, while the face value of

19  the Accounts may exceed $10.0M, there are always difficulties in collection of accounts

20  receivable after a business is shut down, as is the case here.  Many account debtors assert

21  damage and offset claims, and without the availability of the debtors' business people to

22  refute such claims, litigation becomes cumbersome and difficult.  Further, the textile business

23  is infamous for having difficulty in collection of accounts due to insolvency and collectibility

24  issues.  Finally, based on information and belief, the Trustee does not ascribe much value to

25  the Kim Accounts, or their collectibility.

26  / / /

27  / / /

28  / / /

1         **4.**    **The Sale Is The Product Of Good Faith**

2         Although section 363(b) does not explicitly require it, courts have also required

3 that a sale be made in good faith. <u>In re Ewell</u>, 958 F.2d 276, 281 (9th Cir. 1992). The sale

4 discussed herein has been proposed in good faith. Whether a proposed sale is in "good

5 faith" focuses principally on the element of special treatment of the debtor's insiders in the

6 sale transaction. <u>In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.</u>, 77

7 B.R. 15, 21 (Bankr. E.D. Pa. 1987). Hwaseung, the proposed buyer, has not received any

8 special treatment despite the fact that it is the Debtors' single largest creditor by many

9 multiples. While Hwaseung may have had access to more information than other

10 prospective bidders, the Trustee has not precluded any of interest party from inquiring about

11 the Assets, or denied anyone access to information. The Settlement and APA, which must

12 be read in conjunction, were negotiated extensively and at arm's length.

13         **C.**    **The Trustee May Sell The Assets Free And Clear of Liens, Claims,**

14                    **Encumbrances And Interests Under 11 U.S.C. § 363(f)**

15         In accordance with section 363(f), the Trustee may sell the Assets free and

16 clear of any lien, claim, encumbrance or interest. Section 363(f) provides that a trustee may

17 sell assets of the estate free and clear of any interest in such property of an entity other than

18 the estate only if : (1) applicable non-bankruptcy law permits sale of such property free and

19 clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at

20 which such property is to be sold is greater than the aggregate value of all liens on such

21 property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in

22 legal or equitable proceedings, to accept a money satisfaction of such interest. This section

23 of the Bankruptcy Code has been interpreted to be in the disjunctive, rather than the

24 conjunctive. Thus, the Trustee need only demonstrate that one of the elements of this

25 section exists. <u>In re Elliot</u>, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988).

26         In the case of the sale proposed herein, the sale will be subject to the allowed

27 secured claims of IBK (after application of the IBK CD), PBC (to the extent remaining after

28 collection of the Accounts) and the Warehouse claimants. As such, the analysis described

1  above is not applicable to the liens of these claimants.  The sale will be free and clear of the

2  liens of Hwaseung; however, Hwaseung has expressly consented to the sale.  Therefore,

3  with respect to Hwaseung's liens, section 363(f)(2) has been satisfied.  With respect to any

4  other lien, interest, or encumbrance, that may be asserted, such liens would be in bona fide

5  dispute as the Trustee is unaware of them.  To the extent any creditor responds to this

6  Motion, and asserts a secured claim or interest that is not otherwise dealt with in this Motion,

7  the Trustee reserves the right to respond and object to any such secured claim or interest.

8          **D.      The Proposed Bidding Procedures Are Fair And Reasonable Under**

9                  **The Circumstances Of This Case**

10                 Applying Bankruptcy Code section 363, bankruptcy courts frequently have

11  considered and approved auction and bidding procedures in advance of a proposed sale of

12  of the estate.  See, e.g., <u>Doehring v. Crown Corp.  (In re Crown Corp.)</u>, 679 F.2d 774, 775

13  (9th Cir. 1982) (noting that the district court had required specified minimum overbid

14  amounts, deposits, and the form of purchase agreement to be used by bidders); <u>In re</u>

15  <u>Crowthers McCall Pattern, Inc.</u>, 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (noting that the

16  bankruptcy court had entered an order requiring that overbids be made in specified minimum

17  increments with deposits); <u>In re Table Talk, Inc.</u>, 53 B.R. 937, 943 (Bankr. D. Mass. 1985)

18  (noting that Bankruptcy Code section 363 requires notice and a hearing prior to the

19  establishment of bidding procedures for the sale of assets of the the estate).

20                 Courts uniformly recognize that procedures intended to enhance competitive

21  bidding are consistent with the goal of maximizing value to the estate and are appropriate in

22  the context of bankruptcy sales.  <u>In re Financial News Network, Inc.</u>, 126 B.R. 152, 156

23  (S.D.N.Y. 1991), *appeal dismissed*, 931 F.2d 217 (2nd Cir. 1991) ("Court-imposed rules for

24  the disposition of assets … [should] provide for a fair and efficient resolution of the

25  bankruptcy estates.").  In fact, courts have made it clear that the debtor's business judgment

26  is entitled to great deference with respect to the procedures to be used in selling assets from

27  the estate.  *See, e.g.*, <u>Official Comm. of Subordinated Bondholders v. Integrated Resources,</u>

28  <u>Inc. (In re Integrated Resources, Inc.)</u>, 147 B.R. 650, 656-57 (S.D.N.Y. 1992), appeal

1  dismissed, 3 F.3d 49 (2d Cir. 1993) (noting that overbid procedures that have been
2  negotiated by a debtor in possession are to be reviewed according to the deferential
3  "business judgment" standard, under which such procedures and arrangements are
4  "presumptively valid"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y.
5  1989) (*same*).

6          In the case at hand, the bidding procedures are fair and reasonable and are
7  designed to encourage bidding.  There is no break up or "topping" fee proposed, even
8  though such fees are typically required by stalking-horse bidders, such as Hwaseung.  The
9  minimum overbid amounts are reasonable, and in amounts which are intended to create a
10  manageable bidding process.  Finally, the Trustee submits that given the fact that the
11  ultimate purchase price for the Inventory will be in excess of $7.4M and for the Accounts will
12  be in excess of $2.5M (depending on the remaining receivables as of the Cut-Off Date), the
13  Trustee believes that the requirement of a $500,000.00 non-refundable deposit is
14  appropriate and will serve to ensure that only serious parties will participate in the bidding
15  process.

**V.**

**CONCLUSION**

18          Based on the foregoing, in the exercise of his business judgment, the Trustee
19  believes that the APA and the proposed bidding procedures are fair, reasonable and in the
20  best interests of the Estate.

21  / / /
22  / / /
23  / / /
24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

690703.1                                    21

1        The Trustee respectfully requests that this Court enter an order:  (1) granting

2  this Motion; (2) approving the APA; (3) authorizing the Trustee to sell the Assets pursuant to

3  the terms and conditions set forth in the APA and to take any and all actions necessary to

4  further effectuate the terms of the APA; (4) authorizing IBK to apply the IBK CD to the IBK

5  Lien; and (5) providing such other and further relief as is proper.

6

7  DATED:  November 10, 2010       Respectfully submitted,

8                      **Sulmeyer**Kupetz
A Professional Corporation
9

10

                      By:  */s/ Mark S. Horoupian*
11                              Mark S. Horoupian
                              Attorneys for Howard M. Ehrenberg,
12                              Chapter 11 Trustee

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION

1

## DECLARATION OF HOWARD M. EHRENBERG[4]

2

3        I, Howard M. Ehrenberg, declare:

4        1.    I am the duly appointed, qualified and acting chapter 11 trustee for the

5  estate of Selim America, Inc. I make this declaration in support of the motion, pursuant to

6  section 363 of title 11 of the United States Code (the "Bankruptcy Code"), for an Order

7  approving the sale of the inventory and accounts receivable of Selim America pursuant to the

8  asset purchase agreement (the "APA") entered into by and between, myself, in my capacity

9  as chapter 11 trustee, on the one hand, and Hwa Seung Networks America Corp., a/k/a

10  Hwaseung Networks America Corp., a New York corporation (the "Hwaseung", and together

11  with the Trustee, the "Parties"). I further request that the Court approve the proposed

12  bidding procedures contained in the Motion, by which the bankruptcy estate will be assured

13  that it receives the maximum price for these assets. Each of the facts contained in this

14  declaration are based on my personal knowledge, and if called as a witness I could and

15  would competently testify thereto.

16        2.    A true and correct copy of the APA is attached hereto as Exhibit 1.

17        3.    The APA, is contingent upon this Court's approval of the my previously

18  filed motion [Dkt No. 68] (the "Substantive Consolidation Motion"), which seeks to

19  substantively consolidate the Debtor's estate with the estate of Selim Textile, Inc. ("Textile"

20  and, together with Selim America, the "Debtors"). The APA, if approved, would affect both

21  the Debtors' estates (the "Consolidated Estates"), and the proposed sale would transfer the

22  Consolidated Estates' right, title and interest in the accounts receivable and inventory to the

23  ultimate buyer. The proposed sale is also contingent upon the approval of my settlement

24  with Hwaseung regarding the treatment of its claim (the "9019 Motion"). Accordingly, the

25  hearing on this Motion has been set for the same date as the hearings on the Substantive

26  Consolidation Motion and the 9019 Motion.

27

28  [4] All terms not defined herein shall have the same meaning ascribed to them in the Motion.

690703.1             24

1       4.      Through the APA, I propose to sell, and Hwaseung Proposes to

2  purchase, substantially all of the Consolidated Estates assets (the "Assets"), including:

3  (a) all inventory (the "Inventory"); (b) all uncollected accounts receivable due from the

4  Debtors' customers other than any due from June Yong Kim (the "Trade Accounts"); and

5  (c) all uncollected accounts receivable due from June Yong Kim and all obligations owing by

6  June Yon Kim to the Consolidated Estates for any loans that he took from the Debtors

7  (collectively, the "Kim Accounts" and, together with the Trade Accounts, the "Accounts").

8  The purchase price for the Inventory shall be $4.0M plus the assumption of certain secured

9  claims, including those of Industrial Bank of Korea ("IBK") (net of the $2.2M certificate of

10  deposit it is holding), Prime Business Credit ("PBC") (to the extent its claim is not satisfied at

11  the time of closing by its collection of certain accounts receivable), and certain parties

12  holding statutory possessory liens such as warehousemen and maritime liens.  The total

13  amount of the secured claims to be assume are estimated to be $3.45M, assuming a

14  December 31, 2010 closing date for the sale.   With respect to the Accounts, the purchase

15  price shall be 25% of the face value of said accounts, plus the assumption of any

16  outstanding balance owed to PBC.

17       5.      According to information provided by Prime Business Credit to me, it

18  appears that PBC will have been paid in full through its collection of accounts receivable.

19       6.      The APA was entered into as part of larger settlement agreement

20  between the Parties (the "Settlement Agreement") which seeks to resolve all claims,

21  adversary proceedings, and disputes by and among, myself (in my capacity as chapter 11

22  trustee), Hwaseung, the Debtors, and the Consolidated Estates.

23       7.      The APA is contingent upon the Court's entering of an Order approving

24  the Settlement Agreement.  Concurrently with the filing of this Motion, I have filed a separate

25  motion for an order approving the Settlement Agreement.  A copy of the Settlement

26  Agreement is attached hereto Exhibit 2.

27  / / /

28  / / /

8.      The Settlement Agreement generally provides that Hwaseung

shall hold an allowed claim in the amount of $53,361,822.00 (the "<u>Allowed Claim</u>"), secured

by a perfected and unavoidable security interest in the Assets and their proceeds.  In

exchange for the Allowed Claim and the deemed perfection in the Collateral, the Settlement

Agreement, generally provides that Hwaseung will pay to the Consolidated Estate $1.0M for

the benefit of the Consolidated Estates' unsecured creditors, and any shortfall in funds

needed to pay in full all allowed administrative priority claims.

9.      The Motion seeks approval of an agreement that will sell substantially all

of the Consolidated Estates' Assets to Hwaseung, or the highest bidder, pursuant to

section 363 of the Bankruptcy Code.  Hwaseung is the Debtors' largest creditor and, if the

Settlement Agreement pending before this Court is approved, Hwaseung would maintain a

perfected and unavoidable security interest in all the Assets.  The APA proposes to allow

Hwaseung to credit bit up to the amount of its Allowed Claim for the purchase of the Assets.

The APA is contingent upon this Court's approval my Substantive Consolidation Motion and

on the approval of the Settlement Agreement.

10.     Generally, the APA proposes to sell the Inventory for $4.0M plus the

assumption of certain liens senior to Hwaseung (with an estimated amount claimed by said

lienholders, assuming a December 31, 2010 closing date will be $3.45M) and the Accounts

that remain uncollected and outstanding for 25% of their face value.  Further, the APA, as

detailed below, provides bidding and overbidding procedures for the proposed sale of the

Assets.

11.     The APA will provide for the liquidation of the Debtors' Assets in an

efficient and expeditious manner that will guarantee a substantial recovery for the benefit of

the Consolidated Estates.  I believe the proposed purchase price for the Assets is fair and

reasonable, especially in light of uncertainties with respect to the collectability of the

Accounts, and the location and condition of certain of the Inventory, as discussed below.

/ / /

/ / /

1  Moreover, the APA along with the Settlement Agreement ensure a consensual resolution of
2  all issues between the Parties that will avoid the substantial administrative expenses and
3  costs inherent with objecting to Hwaseung's claims and litigating issues pertaining to
4  Hwaseung's security interests.

5      12.    I believe that the APA is in the best interests of the Consolidated
6  Estates.  Accordingly, the I urge the Court to grant the Motion and approve the APA.

7      13.    According to the documents I have reviewed, and discussions I have
8  had with the involved parties, Hwaseung was the Debtors' principle supplier of textile goods.
9  The Debtors would purchase product from Hwaseung on credit and subsequently ship those
10 products to the United States. The product would be stored in third party warehouses
11 pending sale to the Debtors' customers.  According to America, the relationship between
12 America and Textile was as follows:  Textile would purchase the goods from Hwaseung;
13 Textile would "sell" the goods to America, and would create an intercompany receivable from
14 America to Textile; America would then sell the goods to its customers, which would create a
15 receivable from the customer to America.  From the Debtors' records, it is unclear if America
16 ever paid Textile for any of the goods America  "purchased" from Textile.

17     14.    In Textile's "List of Creditors Holding 20 Largest Unsecured Claims" [Dkt
18 No. 1, p. 7 in the Textile Case], filed by Textile at the commencement of its case, Textile
19 verified under penalty of perjury that Hwaseung held a claim against Textile in the amount of
20 $53,361,822.00.  Hwaseung has asserted that, in connection with its sale of product to the
21 Debtors, the Consolidated Estates in fact owe Hwaseung in excess of $59.0M.    The
22 Settlement Agreement propose to allow Hwasueng's claim in the amount of $53,361,822.00
23 (the "Allowed Claim Amount").

24     15.    Hwaseung has further asserted that, pursuant to a security agreement
25 which was signed in January of 2010 and a UCC financing statement that was filed in the
26 state of New York in May 2009, it maintains a valid and perfected security interest in
27 substantially all of the Consolidated Estates' assets (the "Collateral"), including:  (a) all
28 inventory (the "Inventory"); (b) all accounts receivable due from the Debtors' customers other

690703.1                                                 27

than any due from June Yong Kim (the "<u>Trade Accounts</u>") and any and all sums collected thereon; and (c) all accounts receivable due from June Yong Kim, all obligations owing to the Consolidated Estates for any loans taken from the Debtors (collectively, the "<u>Kim Accounts</u>", and together with the Trade Accounts, the "<u>Accounts</u>") and any and all sums collected thereon. The extent, priority, and validity of Hwaseung's liens against the Consolidated Estates is the subject of the Hwaseung Adversary Proceeding. The Settlement Agreement proposes to deem Hwaseung maintaining validly perfected and unavoidable liens.

16.    The Debtors' Inventory consists primarily of yarn and fabric. (A detailed description of the Inventory proposed to be sold is contained in Exh. "A" to the APA, which is attached hereto as <u>Exhibit 1</u>.) The Inventory is presently being stored in certain third party warehouses. The three logistic companies responsible for currently storing the Inventory are Frontier Logistics, Inc. ("Frontier"), Uni Global Logistics, Inc. ("Uni-Global"), and Unico Logistics Co, Ltd. ("Unico"). The Inventory at Frontier is located at two warehouses located at 1700 N. Alameda Street, Compton, CA 90222, and 14439 S. Avalon Blvd., Gardena, CA 90248. The Inventory at Uni-Global is located in three separate warehouses located at UDT, 801 W. Artesia Blvd., Compton, CA 90220; Harbor Choice, 500 E. Gardena Blvd., Gardena, CA 90248; and BNX Shipping, Inc., 910 E. 236th St., Carson, CA 90745. Five containers of the Unico Inventory are located at its warehouse located at 10711 Walker St., Bldg D-Rear, Cypress, CA, and five additional containers of inventory are being held in its warehouse in Pusan (aka Busan), Korea.

17.    As noted above, the Debtors generated Accounts Receivable from the sale of product, primarily yarn and fabric supplied by Hwaseung, to their customers. The accounts proposed to be sold consist of: (a) all accounts receivable due from the Debtors' customers other than any due from June Yong Kim (the "<u>Trade Accounts</u>"); and (b) all accounts receivable due from June Yong Kim and all obligations owing by June Yon Kim to the Consolidated Estates for any loans that he took from the Debtors (collectively, the "<u>Kim</u>

/ / /

/ / /

1  Accounts" and, together with the Trade Accounts, the "<u>Accounts</u>").  Only those Accounts

2  that remain outstanding and uncollected (the "<u>Uncollected Accounts</u>") as of three

3  business days prior to the auction date (the "<u>Cut-off Date</u>") will be sold.

4          18.    To the best of my knowledge and belief, all Trade Accounts are

5  identified in Exh. "B" to the APA.  Further, the APA deems the face amount of the Kim

6  Accounts, as of the date of the filing of this Motion, to be $2.98M.

7          19.    Prior to the Petition Date, PBC, pursuant to a certain factoring

8  agreement, was engaged as the Debtors' collection agent.  Pursuant to the PBC Settlement

9  (the approval of which is pending before this Court), the I have sought to authorize PBC to

10 continue its collection activities.  The APA further provides that the successful buyer of the

11 Uncollected Accounts shall assume all collection agreement entered into by the Trustee with

12 PBC.

13         20.    Even with PBC's best efforts, I believe that the degree of collectability of

14 the Trade Accounts is uncertain.  In contrast, the sale of the Uncollected Accounts would

15 guarantee a substantial recovery for the benefit of the Consolidated Estates.

16         21.    I believe that any attempts to collect the Kim Loans from the Debtors'

17 principal, June Yon Kim ("<u>Kim</u>"), would be time consuming, costly, and, at best, result in a

18 questionable recovery.  On the other hand, the sale of the Kim Accounts would result in

19 guaranteed recover for the benefit of the Consolidated Estates.

20         22.    The APA proposes to sell, as is, where is, and with all faults, the

21 Inventory for $4.0M, plus the assumption of certain secured claims as discussed below.  In

22 addition to being responsible for payment of the secured claims, the buyer will be

23 responsible for payment of any customs, duties, or charges necessary for the release of the

24 Inventory.  None of these charges will be paid by me or the Consolidated Estates.  The total

25 amount of the secured claims to be assumed is below.  As to the Uncollected Accounts, the

26 Purchase Price is 25% of their face value as of the Cut-Off Date for collections by me (three

27 / / /

28 / / /

690703.1                                29

1  business days prior to the sale hearing), plus an assumption of the remaining balance

2  owed to PBC, if any.   The APA proposes to sell the Assets free and clear of all liens

3  except as further detailed below.

4        23.    Industrial Bank of Korea ("IBK") is a creditor of the Consolidated Estates

5  and holds a total claim against Textile in the approximate amount $2,291,068.75, as of

6  November 2, 2010, plus *per diem* interest in the amount of $461.30 (the "IBK Claim").

7  Prepetition, the Debtors posted a letter of credit, in the form of a certificate of deposit, in the

8  amount of $2.2M in favor of IBK (the "IBK CD") to secure the debt owed to it.  IBK further

9  filed a UCC financing statement with the New York Secretary of State, thereby perfecting a

10  security interest in certain of the Debtors' assets (the "IBK Lien").

11        24.    I anticipate that the IBK Lien will be substantially satisfied by allowing

12  IBK to retain and apply the IBK CD, and I will propose to allow IBK relief from stay to apply

13  the IBK CD along with interest accrued thereon, estimated to be approximately $38,500.00

14  as of November 18, 2010.  Nevertheless, the sale of the Inventory shall be subject to any of

15  IBK's valid, perfected, and unavoidable liens against the Assets that secure an allowed claim

16  against the Consolidated Estates, but only to the extent of the remaining amounts owed to

17  IBK by Textile after application of the IBK CD against the IBK Claim.  In other words, the

18  successful bidder for the Inventory shall be responsible for the payment of IBK's remaining

19  claim, which is estimated to be approximately $60,000.00 assuming a closing of the sale of

20  December 15, 2010.

21        25.    The Inventory is presently being stored, and has been stored, in certain

22  third party warehouses.  To the extent that any of these warehouses hold valid, perfected,

23  and unavoidable liens against the Assets securing allowed claims against the Consolidated

24  Estates or otherwise hold a possessory lien that must be paid or otherwise satisfied as a

25  condition to obtaining the release of the Inventory in the possession of such claimant

26  (collectively, the "Warehouse Claimants"), the sale of the Inventory shall be subject to such

27  liens.  In other words, the successful purchaser of the Inventory shall be obligated to assume

28  all liabilities and to pay the Warehouse Claimants to the extent that they hold claims against

1  the Consolidated Estates secured by the Inventory.  In addition, any successful purchaser of

2  the Inventory, and not the Consolidated Estates nor myself, shall be responsible to pay any

3  customs or duties required to obtain the release of the Inventory.

4          26.    The known Warehouse Claimants,[5] and the amounts that they are

5  claiming is owed to each of them, are as follows:

6          a.    Frontier:  The Trustee understands that Frontier is asserting

7  secured claims of $2,417,170.22 as of October 31, 2010 with charges accruing at

8  approximately $17,000.00 per month.  Accordingly, estimated charges, assuming a closing

9  date of December 31, 2010, will be $2,451,653.18.

10         b.    Unico:  The Trustee understands that Unico is asserting secured

11  claims of $308,194.35 (as of September 7, 2010) together with accrued charges for storage,

12  customs, duties, demurage, etc. thereon.  Estimated charges, assuming a closing date of

13  December 31, 2010, will be $350,000.00. (Though requested, Unico did not provide updated

14  figures prior to the filing of this Motion).

15         c.    Uni-Global:  As of the end of November, 2010, the Trustee understands

16  that Uni-Global is asserting a secured claim of $519,781.28, and that charges are continuing

17  to accrue at the approximate rate of $68,000.00 per month. Estimated charges, assuming a

18  closing date of December 31, 2010, will be $588,181.28.

19         27.    In this case, several factors support a finding that the sale is in the best

20  interest of the Estate and that it is based upon a sound business justification.

21         28.    I believe that it is imperative that the Inventory and Accounts be

22  liquidated immediately.  With respect to the Inventory, while it is not perishable, the

23  continued accrual of storage charges will quickly result in a diminution in the net value of the

24  assets. As stated above, the monthly storage fees approaches $100,000.00 per month. As

25  such, it is critical that the Inventory be sold quickly and efficiently. Furthermore, while PBC is

26

27  [5]  Total Known Estimated Secured Warehousemen/Possessory Lien Claims: $3,389,834.30
   (warehouse charges may be subject to proration if closing occurs prior to the end of
28  December).

1  actively engaged in collection of the Trade Accounts, I believe that the more time that

2  passes, the more difficult the Trade Accounts and the Kim Accounts will be to collect and

3  realize value for the benefit of the Estate.

4          29.    The proposed sale eliminates the logistic difficulties associated with the

5  storage of the Inventory, and the costs that would be associated with moving the Inventory.

6  The Inventory consists of many thousands of cartons, with millions of pounds of yarn and

7  other textiles.  If I were compelled to move this Inventory, the cost to the Estate could be

8  staggering.  Instead, through the proposed sale, the Buyer will be responsible for all costs

9  associated with taking physical possession of the goods.

10         30.    The sale benefits the Consolidated Estates in that it will result in the

11 satisfaction of all secured claims.  By the terms of the APA, the liens held by PBC, IBK, and

12 the Warehouse Claimants will be assumed and assigned to the buyer of the Inventory and

13 the Accounts.  These claimants will then be assured of payment in full by the Buyer, as with

14 respect to the warehouse claimants, they will theoretically not release the goods they are

15 holding without first having payment arranged by the Buyer. With respect to PBC, it will be

16 paid through its collection agreement.  Finally, with respect to IBK's remaining claim, if it is

17 not paid, it will attach to the Inventory.  Further, the sale, as proposed, will result in a

18 reduction in Hwaseung's claim of at least $6.5M ($4.0M on account of credit bid for

19 Inventory, and approximately $2.5M credit bid for Accounts).

20         31.    I received several expressions of interest to purchase the Inventory from

21 parties in the textile industry.   Based on these proposals, it became clear to me that

22 Hwaseung's proposal was the only viable option for the Estates.  The expressions of interest

23 revealed to me that it is unlikely, though not impossible, that any party will pay more than the

24 value that is being provided by Hwaseung under the APA.  Indeed, several of the cash offers

25 received by me would not even be sufficient to discharge the secured claims of the

26 Warehouse Claimants.  Nonetheless, through the proposed Bidding Procedures, I and the

27 Consolidated Estates will be assured that the highest price will be obtained for the Assets in

28 the event that someone is willing and able to pay more than the consideration offered by

1  Hwaseung. Furthermore, I considered that holding out for a higher price from a third party

2  would only have a very marginal incremental effect on the Consolidated Estates because of

3  the enormity of Hwaseung's claim, whether secured or unsecured.

4           32.     Given the facts of the case, I believe that the marketing of the sale was

5  adequate. I have maintained contact with the various parties that have expressed an interest

6  in purchasing the Inventory. I have served the notice of the proposed bidding procedures and

7  sale upon those parties, and will work with them to allow them to inspect the Inventory, as

8  discussed above.  I have also published notice of the sale as required by the Local

9  Bankruptcy Rules, and will also post the opportunity on the National Association of

10  Bankruptcy Trustee's asset sale section, as well as the bankruptcy sale section of the

11  website maintained by Danning, Gill, Diamond & Kollitz, LLP.   Given the fact that any

12  increase in the purchase price will inure to the benefit of Hwaseung almost exclusively,  I

13  inquired if Hwaseung wished to incur further marketing expenses, such as the cost of

14  advertisement in trade journals, or national publications.  Hwaseung expressly declined to

15  incur such expense.

16           33.     Through the proposed bidding process, the Consolidated Estates will be

17  assured that they will receive the best and highest bid for the Assets.  Independent of the

18  bidding process, however, I believe that the proposed purchase prices are fair and

19  reasonable.  With respect to the Inventory, the effective purchase price exceeds $7.4M,

20  when factoring in the $4.0M credit bid, and the assumption of more than $3.4M of secured

21  claims.  Based on the expressions of interest received by the me, I believe that this a

22  reasonable price in relation to the value of the goods.  With respect to the Accounts, while

23  the face value of the Accounts may exceed $10.0M, there are always difficulties in collection

24  of accounts receivable after a business is shut down, as is the case here.  Many account

25  debtors assert damage and offset claims, and without the availability of the debtors' business

26  people to refute such claims, litigation becomes cumbersome and difficult.  Further, the

27  textile business is infamous for having difficulty in collection of accounts due to insolvency

28  / / /

1  and collectibility issues.  Finally, based on information and belief, I do not ascribe much

2  value to the Kim Accounts, or their collectibility.

3       34.    The sale discussed herein has been proposed in good faith.  Hwaseung,

4  the proposed buyer, has not received any special treatment despite the fact that it is the

5  Debtors' single largest creditor by many multiples.  While Hwaseung may have had access

6  to more information than other prospective bidders, I have not precluded any party of interest

7  from inquiring about the Assets, or denied anyone access to information.  The Settlement

8  and APA, which must be read in conjunction, were negotiated extensively and at arm's

9  length.

10      35.    I may sell the Assets free and clear of any lien, claim, encumbrance or

11  interest.  Section 363(f) provides that a trustee may sell assets of the estate free and clear of

12  any interest in such property of an entity other than the estate only if:  (a) applicable non-

13  bankruptcy law permits sale of such property free and clear of such interest; (b) such entity

14  consents; (c) such interest is a lien and the price at which such property is to be sold is

15  greater than the aggregate value of all liens on such property; (d) such interest is in bona fide

16  dispute; or (e) such entity could be compelled, in legal or equitable proceedings, to accept a

17  money satisfaction of such interest.  This section of the Bankruptcy Code has been

18  interpreted to be in the disjunctive, rather than the conjunctive.  Thus, the I need only

19  demonstrate that one of the elements of this section exists.

20      36.    In the case of the sale proposed herein, the sale will be subject to the

21  allowed secured claims of IBK (after application of the IBK CD), PBC (to the extent remaining

22  after collection of the Accounts), and the Warehouse claimants.  As such, the analysis

23  described above is not applicable to the liens of these claimants.  The sale will be free and

24  clear of the liens of Hwaseung, however, Hwaseung has expressly consented to the sale.

25  Therefore, with respect to Hwaseung's liens, section 363(f)(2) has been

26  ///

27  ///

28  ///

690703.1

34

1 | satisfied.  With respect to any other lien, interest, or encumbrance, that may be asserted,

2 | such liens would be in bona fide dispute as I am unaware of them.  To the extent any

3 | creditor responds to this Motion, and asserts a secured claim or interest that is not

4 | otherwise dealt with in this Motion, I reserve the right to respond and object to any such

5 | secured claim or interest.

6 |      37.    In the case at hand, the bidding procedures are fair and reasonable

7 | and are designed to encourage bidding.  There is no break up or "topping" fee proposed,

8 | even though such fees are typically required by stalking-horse bidders, such as

9 | Hwaseung.  The minimum overbid amounts are reasonable, and in amounts which are

10 | intended to create a manageable bidding process.  Finally, I submit that given the fact

11 | that the ultimate purchase price for the Inventory will be in excess of $7,400,000 and for

12 | the Accounts will be in excess of $2,500,000 (depending on the remaining receivables as

13 | of the Cut-Off Date), I believe that the requirement of a $500,000 non-refundable deposit

14 | is appropriate and will serve to ensure that only serious parties will participate in the

15 | bidding process.

16 |      38.    Based on the foregoing, in the exercise of my business judgment, I

17 | believe that the APA and the proposed bidding procedures are fair, reasonable and in the

18 | best interests of the Estate.

19 |      I declare under penalty of perjury under the laws of the United States of

20 | America that the foregoing is true and correct.

21 |      Executed this 10th day of November 2010, at Los Angeles, California.

22 |

23 |

Howard M. Ehrenberg

24 |

25 |

26 |

27 |

28 |

35